STATE OF CONNECTICUT *v.* VICTOR TORRES
(SC 15513)

Borden, Berdon, Norcott, Palmer and McDonald, Js.

Argued April 30—officially released August 19, 1997

*Harry Weller,* assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *John Davenport,* assistant state's attorney, for the appellant (state).

*Susan M. Hankins,* assistant public defender, for the appellee (defendant).

*Opinion*

PALMER, J. The defendant, Victor Torres, was convicted after a jury trial of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[1] and 53a-54a (a).[2] The trial court rendered judgment sentencing the defendant to a term of imprisonment of fifteen years. The defendant appealed from the judgment of conviction to the Appellate Court, and a divided panel of that court reversed the trial court's judgment on the ground that the evidence was insufficient to support the jury's guilty verdict.[3] *State* v. *Torres,* 41 Conn. App. 495, 676 A.2d 871 (1996). We granted the state's petition for certification limited to the issue of whether the Appellate Court properly determined that the defendant's conviction was not supported by the evidence. *State* v. *Torres,* 239 Conn. 902, 682 A.2d 1012 (1996). Because we conclude that the evidence was sufficient to sustain the jury's verdict, we reverse the judgment of the Appellate Court.[4]

---

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[3] Judge Schaller dissented from the decision of the majority, concluding that the evidence was sufficient to sustain the defendant's conviction. *State* v. *Torres,* 41 Conn. App. 495, 506–12, 676 A.2d 871 (1996).

[4] On appeal from the judgment of the trial court to the Appellate Court, the defendant also claimed that the trial court improperly admitted evidence of his gang membership because: (1) the prejudicial effect of that evidence

The opinion of the Appellate Court describes many of the facts that the jury reasonably could have found. "The defendant was a 'regional commander' of a street gang known as the 'Latin Kings.' For several weeks, the defendant's gang was involved in an ongoing dispute with a rival gang known as 'Los Solidos.' In the afternoon hours of September 26, 1993, the Latin Kings conducted an emergency meeting . . . to discuss a recent incident in which a member of their gang was shot at by a member of the rival gang. During the meeting, Jose Martinez, a member of the gang and a witness for the state, served as a lookout. Although Martinez had attended nine prior gang meetings in which the defendant had been present [in the two month period immediately preceding the shooting], he did not attend the emergency meeting, nor did he know whether the defendant was there. At the meeting, the gang devised a plan to retaliate for the shooting incident by killing a member of Los Solidos.

"After the meeting, Jose Velez, another gang member, instructed Martinez to keep watch for rival gang members from the roof of a four-story building located on East Clay Street [in the city of Waterbury]. When Martinez arrived, four other gang members, including Velez, were already there. The group possessed an assortment of firearms including an M-16 rifle with a scope, a shotgun and several handguns. Velez had a portable [citizens band (CB)] radio that he used to maintain contact with other gang members, some of whom had remained at Morales' Cafe, which was referred to by the gang as

outweighed its probative value; and (2) admission of the evidence deprived the defendant of his constitutionally protected rights to due process and freedom of association. The Appellate Court did not address these claims because it reversed the trial court's judgment on the ground of evidentiary insufficiency. In light of the fact that the parties have not briefed these issues in this court, we decline to consider them, and the Appellate Court will be required to address them on remand.

'sector one.' Other gang members were stationed in different locations throughout the area.

"At approximately midnight, [one of the victims], Ana Plaza, was returning to her home at 79 East Clay Street, which is located across the street from the building where the group stood lookout on the roof. Plaza was accompanied by her son, Obdulio, her daughter, Melissa, and her infant granddaughter. As Plaza and her family prepared to enter Plaza's house, Velez and the others observed their actions from the rooftop. Velez had a brief conversation over the portable radio with an unknown individual about the activity at the Plaza residence. Immediately following that conversation, Velez instructed his people to fire at the Plaza family. At least three gang members immediately opened fire discharging several rounds of ammunition for a duration of approximately twenty seconds.

"As a result of the gunfire, Ana Plaza was struck by a bullet in her hip and Melissa was struck by a bullet in her arm. As both women began screaming, Obdulio ran into the house and phoned the police and an ambulance. Meanwhile, the shooters fled from the roof of the building into a vacant apartment, stuffed their weapons into a duffel bag and ran from the area.

"Approximately ten days later, the police arrested the defendant and several other members of the Latin Kings. In an oral statement to Detectives Robert Henderson and Mark Deal of the Waterbury police department, the defendant admitted that he was a member of the Latin Kings and that he held the rank of regional commander at the time of the shooting. Although the defendant denied any personal involvement in the shooting, he informed the police that several members of a gang called the 'Nietas,' who were allied with his gang, were responsible for the shooting. The defendant stated that one of the shooters was called 'Cano,' and

that a Latin King called 'Rambo' had helped with the disposal of the weapons used in the shooting." *State* v. *Torres,* supra, 41 Conn. App. 496–97.

At the conclusion of the trial, the jury found the defendant guilty of conspiracy to commit murder.[5] The defendant thereafter moved for a judgment of acquittal, claiming that the evidence was insufficient to support the jury's verdict. The trial court denied the defendant's motion. The defendant appealed to the Appellate Court, which reversed his conviction on the ground that the jury's verdict was not supported by the evidence. This certified appeal followed.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *James,* 237 Conn. 390, 435, 678 A.2d 1338 (1996). "In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown,* 235 Conn. 502, 510, 668 A.2d 1288 (1995).

"While the jury must find every element proven beyond a reasonable doubt in order to find the defen-

---

[5] The defendant also had been charged with attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2), 53a-54a (a) and 53a-8 (a), and first degree assault in violation of General Statutes § 53a-59 (a) (1). Following the presentation of the state's case, the trial court granted the defendant's motion for judgment of acquittal with respect to those charges.

dant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 617, 682 A.2d 972 (1996). Moreover, "[i]n evaluating evidence that could yield contrary inferences, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence." *State* v. *DeJesus*, 236 Conn. 189, 195, 672 A.2d 488 (1996). "As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt; *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994); *State* v. *Patterson*, [229 Conn. 328, 332, 641 A.2d 123 (1994)]; *State* v. *Little*, 194 Conn. 665, 671–72, 485 A.2d 913 (1984); nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *DeJesus*, supra, 196; see also *State* v. *Sivri*, 231 Conn. 115, 134, 646 A.2d 169 (1994).

Furthermore, "[t]his court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." *State* v. *Tomasko*, 238 Conn. 253, 258, 681 A.2d 922 (1996). Accordingly,

"[w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) Id. Finally, "[i]n reviewing the jury verdict, it is well to remember that [j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Ford*, supra, 230 Conn. 693; *State* v. *Little*, supra, 194 Conn. 674; see also *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985) ("[i]t is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom").

Because the defendant was convicted of conspiracy to commit murder, we also must consider the essential elements of the crime of conspiracy. "To establish the crime of conspiracy [to commit murder . . . the state must show] that an agreement was made between two or more persons to engage in conduct constituting [the crime of murder] and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . While the state must prove an agreement [to commit murder], the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . .

Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 245–46, 690 A.2d 1370 (1997); *State* v. *Taylor*, 239 Conn. 481, 495–96, 687 A.2d 489 (1996).

Guided by these principles, we consider whether the Appellate Court properly determined that the evidence was insufficient to sustain the defendant's conspiracy conviction. The defendant does not dispute either that members of the Latin Kings conspired to kill a member of the Los Solidos gang or that this illegal agreement culminated in the ambush of the victims on September 26, 1993. Rather, the defendant contends that there was insufficient evidence to establish that he was part of the illicit plan. We agree with the state that the evidence adduced at trial, considered cumulatively and viewed in the light most favorable to sustaining the verdict, was sufficient to support the jury's finding of guilt beyond a reasonable doubt.

The following additional facts, relevant to our resolution of this issue, reasonably could have been found by the jury. As a result of his investigation, Henderson learned that members of the Latin Kings had occupied various positions throughout Waterbury's south end on the evening of the shooting in order to implement the gang's plan to kill a Los Solidos gang member. Communication among the various locations was maintained through a CB channel on walkie-talkies, some of which Henderson subsequently retrieved. According to Martinez,[6] the four other members of the Latin Kings assigned to the rooftop of the building on East Clay Street with Martinez were heavily armed with shotguns, handguns and automatic weapons. Martinez further testified that, while acting as a rooftop lookout, he had heard the

---

[6] Martinez was the state's key witness at trial.

defendant's voice, among others, broadcast over Velez' walkie-talkie.[7] At approximately midnight, Velez, immediately after speaking with an unidentified person over his walkie-talkie, gave the order to fire at the victims.

Martinez also testified that the defendant was located at "sector one" at the time Martinez heard his voice over Velez' walkie-talkie, and that "sector one" was Morales' Cafe in Waterbury, one of the locations where members of the Latin Kings had been stationed in connection with the implementation of the plan. Martinez further indicated that, after the emergency meeting at which the illegal scheme was approved, members of the Latin Kings who had attended that meeting reviewed the plan with those gang members who, like Martinez, already had taken their positions and, consequently, were not present at the meeting.

In his interview with Henderson after the shooting, the defendant acknowledged that he was the regional commander of the Waterbury Latin Kings, and that he previously had served as the gang's president and philosopher. On the basis of his conversation with the defendant, Henderson concluded that, although he was reluctant to implicate himself in the conspiracy, the defendant had demonstrated "a lot of knowledge" regarding the shooting and had revealed information concerning the crime that was not available to the general public at the time.

The jury, considering the cumulative weight of all the evidence, reasonably could have inferred that the defendant had joined with his fellow gang members in the conspiracy to kill a member of the Los Solidos. First, the testimony by Martinez and Henderson regarding the

[7] Although Martinez did not hear what the defendant said on the walkie-talkie, he unequivocally identified the defendant's voice. Martinez stated that he had known the defendant for two months and had spent, in total, several hours in conversation with him.

defendant's rank in the organization, viewed in combination with the other evidence adduced at trial, supports such an inference. In light of the defendant's rank as regional commander for the Waterbury Latin Kings, his attendance at numerous gang meetings in the months immediately preceding the shooting, and his presence at Morales' Cafe in the hours leading up to the shooting, the jury reasonably could have inferred either that the defendant had attended the planning meeting or, alternatively, that he otherwise had participated in or approved of the scheme. The jury heard testimony regarding various leadership positions held by Latin King members, including those of president and regional commander, and that the gang met regularly as a group. The evidence also established that, in connection with the Latin Kings' plan to retaliate against the Los Solidos, members of the Latin Kings had armed themselves with automatic weapons, deployed armed members at various "sectors," and communicated with each other over portable radios. In view of this evidence, the jury reasonably could have inferred that the Latin Kings operated in a paramilitary fashion with a hierarchical chain of command. Consequently, the jury reasonably could have concluded that a scheme as important and well organized as the plan to kill a rival gang member would not have been undertaken without the prior approval of the Latin King leadership, including its regional commander,[8] who previously had served as its president and philosopher.

Other evidence supports the inference that the defendant was actively involved in the gang's illegal operations on the night of the shooting. Martinez testified that the defendant was present at "sector one," one of the locations where members of the conspiracy were

---

[8] We note that the common meaning of the term "commander" is "one in an official position of command or control . . . ." Webster's Third New International Dictionary.

stationed. The jury also heard testimony from Martinez that the defendant had communicated from "sector one" over Velez' walkie-talkie during the hours leading up to, and culminating in, the shooting. It was reasonable for the jury to infer, therefore, that the defendant's presence at "sector one" with other gang members involved in the plan was neither coincidental nor innocent, especially in view of the defendant's rank in the organization. Moreover, because the evidence supported the inference that Velez and his confederates on the rooftop were waiting for authorization to begin shooting and, further, that such authorization had come over the walkie-talkie, it also would have been reasonable for the jury to have inferred that the Latin Kings' use of walkie-talkies was integrally related to the conspiracy. Finally, the jury reasonably could have inferred that, in light of his position as regional commander, his presence at "sector one," and his voice transmission over the radio system used by the conspirators to communicate with one another, the defendant had obtained the information which he later conveyed to Henderson regarding the illegal plan as a direct result of his participation in the conspiracy.

In concluding that the evidence was insufficient to support the guilty verdict, the Appellate Court identified several purported deficiencies in the testimony that the state claimed constituted circumstantial proof of the defendant's involvement in the conspiracy. This evidence included: (1) the defendant's voice communication over Velez' walkie-talkie at some time prior to Velez' order to shoot; (2) the defendant's rank as regional commander of the Waterbury Latin Kings; and (3) the information provided by the defendant to Henderson regarding the perpetrators of the shooting. *State v. Torres*, supra, 41 Conn. App. 501. In concluding that the jury reasonably could have considered this evidence as a link in a chain of inferences leading to a finding

that the defendant had been part of the conspiracy, Judge Schaller, in his dissent; see footnote 3 of this opinion; expressed the view that the majority improperly had "discredit[ed] the evidence that the jury chose to credit." *State* v. *Torres*, supra, 41 Conn. App. 506–507. For the following reasons, we agree with Judge Schaller.

First, the Appellate Court declined to accord any weight to Martinez' testimony that he had heard the defendant's voice over Velez' walkie-talkie. Id., 502–503. Specifically, the Appellate Court concluded that this evidence was insufficient to establish either that the defendant had communicated directly with any of the gang members who fired the shots from the rooftop, or that the defendant was located at "sector one" when Martinez heard his voice transmission over Velez' walkie-talkie. Id. In support of its first point, the Appellate Court relied on the fact that Martinez did not testify as to the time, nature, duration or substance of the communication. Id., 502. Even if we assume, arguendo, that Martinez' testimony was inadequate to support an inference that the defendant had communicated directly with Velez, we note that the state was not required to prove that these individuals had communicated directly with each other in order to establish the defendant's involvement in the Latin Kings' illegal plan. Rather, the fact that the defendant's voice was overheard on the radio system used by the conspirators to communicate with one another during the critical period leading up to the shooting, when viewed in combination with the other evidence, reasonably supports an inference that the defendant was part of the conspiracy.

We also disagree with the Appellate Court's assertion that Martinez' testimony regarding the defendant's presence at "sector one" was not sufficiently reliable to be accorded any weight by the jury. The Appellate Court concluded that the jury could not reasonably have cred-

ited this evidence because Martinez failed to provide the basis for his knowledge of the defendant's presence at "sector one" and, further, that there was no evidence that "sector one" was a command post. Id., 503. The defendant, however, never challenged the foundation of Martinez' testimony that the defendant was located at "sector one." Moreover, Martinez testified that he and the other Latin Kings who had not attended the emergency meeting were apprised of the details of the plan by gang members who had attended that meeting. Furthermore, the jury reasonably could have inferred that "sector one" was a command post because the name "sector one" suggests the primacy of that location and, according to Martinez, the defendant, the gang's regional commander and past president and philosopher, was present there. In light of Martinez' testimony that "sector one" was one of the locations where lookouts were stationed, however, it was not critical for the state to have established that "sector one" was a command post. Finally, although Martinez did not testify that the defendant had disclosed his location when he spoke over the walkie-talkie, we note that Martinez did indicate that fellow gang members who had attended the emergency meeting had provided Martinez with information regarding the illegal plan discussed at the meeting. The jury reasonably could have inferred that Martinez was told where the defendant would be located during this debriefing. Consequently, the jury reasonably could have credited Martinez' testimony regarding both that the defendant was present at "sector one," and that "sector one" was one of the designated sites from which the plan was to be implemented.

Second, the Appellate Court concluded that the jury could not reasonably have drawn any incriminatory inferences as a result of the defendant's rank as regional commander of the Waterbury Latin Kings. Id., 504. In support of this conclusion, the Appellate Court noted

that the evidence indicated that the defendant had not presided over the prior gang meetings attended by Martinez, and that there was no testimony regarding the specific role of the regional commander or the internal structure of the Latin Kings. Id. Because the reasonable inferences to be drawn from the defendant's rank in the organization do not depend on either of these evidentiary lacunae, we do not agree with the Appellate Court that the jury was required to ignore the defendant's leadership role in the gang in determining whether he was a member of the conspiracy. The jury was entitled to use its common sense and judgment in evaluating the relationship, if any, between the defendant's past and present positions in the Latin Kings and the likelihood of his involvement in the conspiracy. This is particularly true in view of the evidence adduced by the state establishing the hierarchical nature of the gang, and the organized manner in which the illegal plan was executed.

Finally, the Appellate Court found "nothing of an inculpatory nature in the defendant's responses to Detective Henderson's questions despite Henderson's opinion that the defendant 'was reluctant to admit his involvement' in the conspiracy." Id. The Appellate Court noted that "Henderson testified that the defendant expressly denied any involvement in the conspiracy, and that he could have learned whatever information he possessed about the shooting after it had occurred." Id., 504–505. The Appellate Court concluded that the jury could not reasonably have inferred that the defendant's knowledge about the crime derived from his involvement in the conspiracy, rather than from discussions with gang members after the incident. Id., 505. We disagree.

Henderson testified that, although the defendant was "reluctant to implicate himself in the actual shooting," he both identified one of the shooters and provided

detailed information regarding the disposal of the weapons used during the incident.[9] "That the jury might have drawn *other possible inferences* from these facts is not sufficient to undermine its verdict, [because] proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Grant,* 219 Conn. 596, 604, 594 A.2d 459 (1991); see also *State* v. *Bruno,* 236 Conn. 514, 545–46, 673 A.2d 1117 (1996). Consequently, in view of the defendant's position as regional commander, his presence at "sector one," and his voice communication over the radio used by the conspirator who relayed the order to shoot, we conclude that the jury reasonably could have inferred that the defendant's knowledge of the details of the conspiracy derived from his direct participation in it.[10]

[9] Henderson further testified that the defendant admitted his previous positions as president and philosopher of the Waterbury Latin Kings. Henderson's testimony also corroborated Martinez' testimony in certain key respects, including the reason why the Latin Kings were attempting to kill a rival gang member, the manner in which the ambush was accomplished, and the identity of the persons actually involved in the shooting.

[10] The Appellate Court also concluded that the record did not support the assertion that the defendant had attended each of the nine meetings that Martinez had attended. *State* v. *Torres,* supra, 41 Conn. App. 504. We disagree. While Martinez' testimony was not always completely consistent, "[i]nconsistencies do not render a witness' testimony incredible as a matter of law. . . . It is uniquely the province of the trier of fact . . . to determine the import of the evidence by gauging the credibility of the witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Jones,* 234 Conn. 324, 332–33, 662 A.2d 119 (1995). The trial transcript contains the following testimony by Martinez during redirect examination by the state:

"[John Davenport, Assistant State's Attorney:] In your statement you mentioned that you had been in about nine meetings with Latin Kings at the point you gave the statement; is that correct?

"From the evidence presented, the jury reasonably could have found that the defendant held a series of leadership positions in the Waterbury branch of the Latin Kings, including president, culminating in his position as regional commander. He regularly attended the Latin Kings meetings, including all of the meetings at which Martinez had been present. On the day of the emergency meeting, held in the midst of a 'war' with a rival gang, he was present at the sector established as part of the conspiracy to shoot a member of Los Solidos, and he communicated before the shooting with Velez on the rooftop. Because no Latin Kings leaders were on the roof, and [because a radio] communication immediately preceded the shooting, the jury reasonably could have inferred that Latin Kings leaders were at sector one, where the defendant, who was a leader, was located. From the defendant's leadership position, his regular attendance at meetings, the emergency nature of the situation and the fact that the defendant employed a [walkie-talkie] for communication, all of which were integral parts of the plan to commit the murder, and that the plan proceeded without interruption after the defendant's communication with Velez, the jury reasonably could have inferred that the defendant knew of the plan to kill a member of Los Solidos, agreed to conspire to commit the murder, shared the intent to commit the murder and that a coconspirator committed an act in furtherance of the conspiracy.

"[Jose Martinez:] Yeah.

"Q. Were many of the people you dealt with that night at those meetings as well?

"A. Yeah.

"Q. Yes. Was Victor Torres at those meetings?

"A. When, before?

"Q. Yeah, the one you spoke when you say the nine meetings that you had attended?

"A. Yeah.

"Q. He had been there before?

"A. Yeah."

"Having drawn those reasonable inferences concerning the defendant's participation and shared intent, the defendant's disclosure ten days later, in Henderson's words, of 'a lot of knowledge' about the incident, not readily available 'in the general public' could have led to further reasonable inferences of the defendant's guilt of the crime charged. The fact that the evidence was disputed or that other inferences could have been drawn is not relevant to our review. As long as evidence existed from which the jury reasonably could have found the facts and drawn the inferences leading to its guilty verdict, it is our obligation to defer to those findings and inferences in passing on this sufficiency challenge." *State* v. *Torres*, supra, 41 Conn. App. 510–11 (*Schaller*, *J.*, dissenting).

Consequently, although "no clear line of demarcation exists between a permissible inference and an impermissible speculation"; *State* v. *Sivri*, supra, 231 Conn. 165 (*Peters*, *C. J.*, dissenting); we are persuaded that the inferences reasonably drawn from the evidence, taken together and viewed in the light most favorable to sustaining the jury's verdict, supported the jury's finding of guilt. In so concluding, "[w]e acknowledge that [our] reasoning requires us to posit a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain. That is essentially what circumstantial evidence means, however, and it is what our case law generally permits. We also acknowledge that this is not an easy case. We conclude, nonetheless, that it is a case in which the jury's [conclusion that the defendant was a member of the conspiracy] was sufficiently supported by the circumstantial evidence." Id., 130–31. Although another jury rationally could have reached a different conclusion, we cannot say that this particular jury verdict lacked sufficient support in the evidence. Accordingly, we conclude that the Appellate Court improperly

reversed the judgment of conviction rendered by the trial court.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendant's remaining claims on appeal.

In this opinion BORDEN, NORCOTT and MCDONALD, Js., concurred.

BERDON, J., dissenting. I disagree with the majority because there was insufficient evidence to support the defendant's conviction of conspiracy to commit murder. In my view, the defendant's conviction boils down to a finding of "guilt by association."

This case requires us to revisit a basic principle of constitutional law. Justice Brennan, in *In re Winship*, 397 U.S. 358, 362–64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), writing for a majority, stated: "Expressions in many opinions of this Court indicate that it has long been assumed that proof of a criminal charge beyond a reasonable doubt is constitutionally required. . . . The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about

his guilt." (Citations omitted; internal quotation marks omitted.) In addition, Justice Brennan wrote: "[U]se of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

"Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Id., 364.

"In determining whether the evidence is sufficient to sustain a verdict, we have said that the issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. . . . Each essential element of the crime charged must be established by proof beyond a reasonable doubt . . . and although it is within the province of the jury to draw reasonable logical inferences from the facts proven, they may not resort to speculation and conjecture. . . . A conclusion of guilt requires proof beyond a reasonable doubt, and proof to that extent is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other rational conclusion." (Citations omitted;

internal quotation marks omitted.) *State* v. *Little*, 194 Conn. 665, 671, 485 A.2d 913 (1984).

The evidence that the majority finds sufficient to support the defendant's conviction is the same evidence that the Appellate Court concluded was insufficient to support a conviction. The Appellate Court summarized this evidence by indicating that "the state attempts to build its case on a foundation comprised of three facts: (1) The defendant was a regional commander in the Waterbury Latin Kings gang; (2) [Jose] Martinez [another Latin Kings gang member] heard the defendant's voice over [gang member Jose] Velez' portable radio on the rooftop sometime during the evening of the occurrence; and (3) the defendant displayed inside knowledge of the shooting when he was interrogated by the police ten days later." *State* v. *Torres*, 41 Conn. App. 495, 501, 676 A.2d 871 (1996).

When considering the state's inference based case, the Appellate Court aptly explained that "[t]he difficulty we have in accepting the state's argument is the lack of predicate facts from which the jury could reasonably have drawn the appropriate permissive inferences that the defendant was present at the emergency meeting or was in communication with the rooftop shooters. Furthermore, there is nothing in the defendant's oral statement to the police to allow the jury to infer that he had prior knowledge of the conspiracy." Id.; see also *State* v. *Sivri*, 231 Conn. 115, 165, 646 A.2d 169 (1994) (*Peters, C. J.*, dissenting) ("[w]hen there are no ascertainable facts from which the appropriate inferences may reasonably be drawn, the presumption of innocence requires a conviction to be set aside"); *State* v. *Sivri*, supra, 167 (*Berdon, J.*, dissenting) ("[s]peculative evidence, no matter how cumulative, cannot support an inference or series of inferences upon which an element of a crime can be proven beyond a reasonable doubt"). In a lengthy and detailed decision, and after

carefully scrutinizing all of the evidence, the Appellate Court "conclude[d] that, when evaluated under the appropriate standard, the evidence in this case is insufficient to support the defendant's conviction of conspiracy to commit murder." *State* v. *Torres*, supra, 41 Conn. App. 505. Due to the fact that there was insufficient evidence, the defendant in this case has not been proven guilty beyond a reasonable doubt and his conviction should be reversed. Because I agree with the Appellate Court's reasoning and its result, I endorse that opinion and incorporate it herein.

Accordingly, I dissent.