## STATE OF CONNECTICUT v. KENNETH HENRY
## (AC 15876)

O'Connell, C. J., and Spear and Sullivan, Js.

---

Argued March 4—officially released June 9, 1998

*Richard L. Grant*, for the appellant (defendant).

*Paul J. Ferencek*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David P. Gold*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. On January 25, 1996, the defendant was found guilty, after a jury trial, of criminal attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a, assault in the second degree in violation of General Statutes § 53a-60 (a) (2) and carrying a pistol without a permit in violation of General Statutes § 29-35. In this appeal from the judgment of conviction, the defendant claims that (1) the trial court improperly permitted the state to ask questions during voir dire that infringed on his constitutional right to a fair trial and (2) the evidence was insufficient to support his conviction. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of April 8, 1994, the victim, Albert Eaddy, took a bus to the "Hill" area of New Haven to visit with his children's aunt, Karen Yopp. Eaddy was with another male whom he met through a friend named

Dominique. When he arrived at Yopp's apartment, Eaddy called Dominique to set up a meeting with Dominique and his friend. The meeting was to take place at a nearby Dairy Queen. Subsequently, Eaddy and his friend left Yopp's apartment and walked to Dairy Queen. Later, Eaddy left Dairy Queen to return to Yopp's apartment. On the way back to the apartment, he saw two friends, Jonathan and Tatair, standing at the corner of Downing and English Streets. As Eaddy began walking toward his friends, the defendant approached Eaddy and accused him of robbing him at gunpoint two or three months earlier. Eaddy explained to the defendant that that was impossible because Eaddy had been in jail at that time. The defendant pulled out a gun and a scuffle ensued. During the scuffle, Eaddy was shot three times in the leg before the gun jammed. The defendant then held the gun to Eaddy's head. When the defendant attempted to fire the gun, it again jammed and would not fire. Eaddy then chased the defendant, who jumped into his car and drove away.

Eaddy remained in the area and the defendant later returned with his cousin and his brother Ernest Henry. The defendant and Eaddy then challenged each other to a fight. The defendant and the others present pulled out guns. Ernest Henry grabbed the defendant's gun from him, and Eaddy persuaded the others to put their guns away. The defendant, his cousin and Ernest Henry then left the area. Jonathan and Tatair suggested to Eaddy that he have his leg treated at a hospital because it was beginning to swell. Eaddy refused and instead drank beer, smoked marijuana and snorted cocaine with Jonathan, Tatair and other friends.

In the early morning of April 9, 1994, Eaddy went to a hospital to have his leg treated. The police spoke to Eaddy at the hospital, but he did not identify the defendant as his assailant. After he received treatment for his wounds, Eaddy signed himself out of the hospital

against medical advice. He then returned to the Hill area of New Haven where he remained for five or six days looking for the defendant, hoping to shoot him. Eaddy never located the defendant. Also, during that time, Eaddy hid from the police, whom he knew wanted a statement from him about the shooting. Finally, on May 23, 1994, Eaddy's mother persuaded him to give the police a statement about the shooting. Eaddy gave the police a taped statement, which was transcribed and signed by Eaddy. Eaddy also selected the defendant's photograph from a photographic array and positively identified him as the shooter.

At the time of trial, Eaddy was thirty-four years old and had an extensive criminal record that included two 1981 convictions for robbery in the first degree, a 1982 conviction for assault,[1] a 1984 conviction for assault in the first degree, a 1987 conviction for robbery in the second degree, a 1990 conviction for assault in the second degree and a 1992 conviction for larceny in the second degree. Eaddy also had state criminal charges pending against him for burglary in the first degree, robbery in the first degree, attempted assault in the first degree and risk of injury to a child. In addition, at the time of trial, Eaddy was incarcerated for violating his probation on one of the prior convictions. Just prior to the trial in this case, Eaddy had pleaded guilty to a federal weapons charge.

I

The defendant's first claim is that the trial court allowed the state to ask improper questions of the venirepersons during voir dire, thereby infringing on his right to a fair trial by an impartial jury under the sixth and fourteenth amendments to the United States constitution and the constitution of Connecticut, article first, § 8. Specifically, the defendant claims that the

---

[1] At trial, the degree of assault was not disclosed.

state's questions were improperly designed to obtain the prospective jurors' views on particular facts relating to Eaddy's criminal background, and to "immunize" jurors against disbelieving Eaddy's testimony despite this background. We disagree.

"The extent to which parties should be allowed to go in examining jurors as to their qualifications is a matter largely resting in the sound discretion of the trial court, the exercise of which will not constitute reversible error unless clearly abused, and where harmful prejudice appears to have been caused thereby." (Internal quotation marks omitted.) *State* v. *Sheets*, 40 Conn. App. 328, 331, 671 A.2d 366, cert. denied, 237 Conn. 903, 674 A.2d 1334 (1996).

The first venireperson questioned was Richard J. Czarkowski. The state informed him of Eaddy's criminal record, that Eaddy was presently incarcerated, and that he would testify at the trial. The prosecutor then asked: "Do you feel that because someone [is] in jail or because someone [has] been arrested or convicted, that, plain and simply, they can't be believed?" He also asked Czarkowski if he understood the concept that "[w]hen somebody steps into that box, in the witness box, everybody starts off even-Steven. Nobody gets an advantage because, like the judge said, because he or she may be a police officer, nobody gets a disadvantage because he or she might be unemployed or somebody that isn't a saint."

The prosecutor next asked Czarkowski if he believed that a person previously convicted of a crime "forfeits" his right to come to court as the victim of a crime. The prosecutor asked Czarkowski if Eaddy's criminal background would cause him automatically to disbelieve Eaddy's trial testimony, or if, despite that background, he could listen to the testimony "just like you [would] do anybody else." The prosecutor also asked

the following question: "[W]hen you see Mr. Eaddy, you're going to find out things about him and you're not going to like it . . . but the fact of the matter is you have to think now whether or not if you heard bad things about him you would automatically say, forget it, I can't believe him, or you're still going to listen to what he says just like you do anybody else . . . and . . . even if Mr. Eaddy is not a saint, would you be able to come out here and say 'guilty?' "

Ultimately, the state excused Czarkowski. Before the next venireperson was questioned, there was argument by each counsel concerning the questions being asked by his opponent. Defense counsel objected to the foregoing questions as misleading because they wrongly implied that jurors are not permitted to consider prior felony convictions in judging a witness' credibility. The state argued that defense counsel should be prohibited from stating that the defendant had been convicted of a crime at the age of sixteen because this wrongly implied that the defendant had no other criminal record. The trial court ruled that "[w]e are not going to specifically identify any witness as having a criminal record. You can raise the possibility that one or more witnesses may come in and you may find out in the course of their testimony they have some criminal problem in their background, however you want to phrase it, but we don't relate it to anyone." Both parties assented to this ruling.

The second and third venirepersons questioned were Robert S. O'Neil and Ann Fischer. The prosecutor asked O'Neil the following question: "[R]egardless of a person's lifestyle or the run-ins the individual witnesses have had with the law, would you hear each witness testify, consider what they have to say, consider their background as the judge says it's relevant, and then decide this case, not on whether you approve of lifestyles, not on whether or not you like certain witnesses,

but on whether or not a crime was committed?" O'Neil responded: "I don't care what the people are like. I mean, whatever I hear by him, that's it." Defense counsel excused O'Neil without raising any objections to the questions asked by the prosecutor.

The prosecutor asked the following questions of Fischer: "Everybody steps into the box, the witness box, on equal footing. You'll listen to what the witness has to say, you'll listen to the relevant factors and decide based on what you've heard what you think happened, what you think didn't happen, what you found believable, what you didn't, but you can't make those decisions, would you agree with me, based on a person's lifestyle, based on the type of uniform they wear, whether it's a badge or an inmate number? Do you agree with that?"[2] Fischer responded: "Definitely." The prosecutor continued: "Along those same lines . . . [d]o you think that a person who has himself violated the law in the past, do you think that if that person is the victim of a crime, that since he's done bad things in the past that he really forfeits his right to come to court and seek justice? Do you see it that way at all?" Fischer replied: "No." The state and the defendant accepted Fischer as a juror.

During the remaining voir dire, the prosecutor and defense counsel informed the venirepersons that some of the witnesses who would be called to testify during the trial may have criminal records. The prosecutor continued to ask the remaining venirepersons questions regarding (1) whether they would automatically disregard the testimony of a witness with a prior criminal record, (2) whether they felt that a convicted felon "forfeited" his right to come to court as a crime victim, and (3) whether they accepted the proposition that

---

[2] Seven of seventeen venirepersons were asked this question.

everyone, regardless of profession or background, "steps into the witness box even."

The statutory right to a voir dire examination of each prospective juror in a criminal action is provided in General Statutes § 54-82f. In 1972, this right was established as a constitutional one by including in article fourth of the amendments to the Connecticut constitution the provision that "[t]he right to question each juror individually by counsel shall be inviolate." (Internal quotation marks omitted.) *State* v. *Hernandez*, 204 Conn. 377, 381, 528 A.2d 794 (1987); *State* v. *Dahlgren*, 200 Conn. 586, 600, 512 A.2d 906 (1986). "[T]he twofold purpose of voir dire [is] to permit the trial court to determine whether a prospective juror is qualified to serve, and to aid the parties in exercising their right to peremptory challenges." (Internal quotation marks omitted.) *State* v. *Hernandez*, supra, 381. "The court has a duty to analyze the examination of venire members and to act to prevent abuses in the voir dire process." *State* v. *Dolphin*, 203 Conn. 506, 512, 525 A.2d 509 (1987).

Our Supreme Court has distinguished between questions as to the qualifications of jurors and hypothetical questions. *State* v. *Sheets*, supra, 40 Conn. App. 331. " '[H]ypothetical questions intended to elicit from a juryman in advance what his decision will be under a certain state of the evidence or upon a certain state of facts should not be permitted by the trial court. A party has no right to assume the facts of a case about to go on trial, and ascertain the juror's opinion in advance.' " Id. On the other hand, " '[t]he court should grant such latitude as is reasonably necessary to fairly accomplish the purposes of the voir dire. Clearly, therefore, if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that

prejudice.' " *State* v. *Dolphin,* supra, 203 Conn. 512. The record of the voir dire in this matter shows that that is exactly what the trial court did in this matter.

The questions asked of the venirepersons were designed to draw out any prejudices they might have against a witness who had a felony criminal record, such as Eaddy, the defendant and other witnesses, and to determine if they would listen to the testimony of Eaddy and then make decisions on his credibility. These questions did not elicit from the venirepersons what their decisions in the case would be on the basis of a certain state of the evidence at trial. See *State* v. *Sheets,* supra, 40 Conn. App. 331. The questions were not framed so as to determine from them whether the venirepersons would believe Eaddy's testimony and thus convict the defendant. The defendant's assertion that certain of the questions asked of the venirepersons "inoculated or immunized" them against disbelieving Eaddy is equally without merit. Not one question gave Eaddy an advantage over any other witness relative to credibility. Accordingly, we find that the trial court did not abuse its discretion in permitting the contested voir dire questions.

## II

The defendant's second claim is that there was insufficient evidence to support his conviction on all of the charges because the jury could not rationally have reconciled the inconsistencies between Eaddy's trial testimony and his prior statements to the police. At the close of the state's case, the defendant moved for a judgment of acquittal, which the court denied. The defendant claimed that the state's entire case was based on Eaddy's testimony and that the jury could not reasonably consider Eaddy to be a truthful witness given the

multiple and substantive inconsistencies in his testimony.[3]

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light

---

[3] The defendant raises fifteen inconsistencies in Eaddy's testimony, as enumerated in the state's brief:

"(1) Eaddy testified on direct examination that he had a ninth grade education, whereas he told [Detective T. W.] O'Donnell that he had a fifth grade education;

"(2) Eaddy testified on direct examination that Jonathan and Tatair had called him over to the corner [of] Downing and English Streets, whereas he told O'Donnell that it was the defendant who had called him over to that location;

"(3) Eaddy testified on direct examination that the defendant did not ask him what his street name was, nor did Eaddy tell him, whereas Eaddy told O'Donnell that the defendant had asked him his street name and that Eaddy had responded, 'Cleeko';

"(4) Eaddy testified on direct examination that the defendant had pulled the gun from his belt, whereas he told O'Donnell that the defendant had pulled the gun from his right pocket;

"(5) Eaddy testified on direct examination that he did not observe the caliber of the gun, whereas he told O'Donnell that it was probably a .25 or .32 caliber pistol;

"(6) Eaddy testified on direct examination that he did not encounter the defendant again after the post-shooting confrontation involving the defendant, his brother, and their cousin, whereas he told O'Donnell that he had seen the defendant three or four times thereafter;

"(7) Eaddy testified on direct examination that, after the shooting, the defendant returned to the scene with two other persons (i.e., his brother and cousin), whereas he told O'Donnell that the defendant returned with three other persons;

"(8) Eaddy testified on direct examination that he had never seen the defendant prior to the shooting incident, whereas he testified on cross-examination that he had recognized Ernest Kevin Henry as the defendant's brother;

"(9) Eaddy testified on direct examination that Jonathan and Tatair had pulled out handguns, whereas he told O'Donnell that they and other people on the scene had pulled out shotguns;

"(10) Eaddy testified on direct examination that the shooting incident occurred at 10:30 p.m. on April 8, 1994, whereas he told O'Donnell that it had occurred at 12:15 a.m. on April 9, 1994;

"(11) Eaddy testified on cross-examination that he did not go to the hospital until at least one hour after the shooting, whereas he told O'Donnell

most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State v. Torres*, 242 Conn. 485, 489, 698 A.2d 898 (1997). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) Id., 490. "Furthermore, [t]his court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) Id.

It was within the province of the jury to believe or to disbelieve Eaddy's testimony. The jury obviously believed the parts of Eaddy's testimony necessary to convict the defendant of the crimes of attempted murder, assault in the second degree and carrying a pistol without a permit. A reasonable view of the evidence would support the jury's verdict on all three offenses. "If there is any reasonable way that the jury might have reconciled the conflicting testimony before them, we may not disturb their verdict." (Internal quotation

that he went to the hospital the next day;

"(12) Eaddy testified on direct and cross-examination that the post-shooting confrontation occurred between 10:30 p.m. of April 8 and 12:30 a.m. of April 9, whereas he told O'Donnell that it had occurred the next day;

"(13) Eaddy testified on direct examination that he remained in the 'Hill' area of New Haven for approximately six days after the shooting, whereas he told O'Donnell that he did not return to the area of the shooting;

"(14) Eaddy told O'Donnell that the defendant wielded the gun in his right hand, whereas at trial, on cross-examination, he denied making that allegation; and

"(15) Eaddy told O'Donnell that the defendant, upon placing the gun to his head, stated, 'know it's you, punk motherfucker,' whereas at trial, on direct and cross-examination, he denied making that allegation."

marks omitted.) *State* v. *Taylor*, 239 Conn. 481, 494, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997). There was sufficient evidence, if believed by the jury, to support the convictions.

The judgment is affirmed.

In this opinion the other judges concurred.