STATE OF CONNECTICUT *v.* CHARLES LITTLE
(10853)

HEALEY, PARSKEY, SHEA, DANNEHY and SANTANIELLO, JS.

Argued October 11—decision released December 18, 1984

*Gail A. Heller,* certified legal intern, with whom was *Michael R. Sheldon,* for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Henry J. Lyons,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. In this case, the defendant, Charles Little, was accused of entering and remaining unlawfully in the residence of Frances M. Hillman on Greens Farms Road in Westport on January 8, 1980, with intent to commit a crime therein.[1] After a trial to the jury, the defendant was convicted of the crime of burglary in the third degree in violation of General Statutes § 53a-103 (a).[2]

On appeal, he claims that the trial court erred in failing to order the entry of a judgment of acquittal on the charge of burglary in the third degree. The basis of this claim is three pronged. He argues that the evidence presented to the jury was insufficient to prove beyond a reasonable doubt that: (1) an unlawful entry occurred at the Hillman home on January 8, 1980; (2) if the unlawful entry did occur, he was the person who entered; and (3) if he did unlawfully enter the Hillman home on January 8, 1980, he entered with an intent to commit a crime therein. We do not agree.

---

[1] The amended information, charging the defendant with committing burglary in the third degree in Westport on January 8, 1980, alleged in part that he "did enter and remain unlawfully in a building, the property of one FRANCES M. HILLMAN, with intent to commit a crime therein, in violation of Section 53a-103 (a) of the Connecticut General Statutes."

[2] General Statutes § 53a-103 (a) provides: "A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

Viewing the evidence in the light most favorable to sustaining the verdict, the jury could reasonably have found the following facts: On January 8, 1980, Frances Hillman owned and resided alone in a twenty-five year old single family home located at 133 Greens Farms Road in Westport. Greens Farms Road runs "practically parallel" to the Connecticut Turnpike (I-95), which is approximately 200 yards south of the Hillman home.

There are three entrances to the Hillman residence. There is one in front of the house to the living room facing Greens Farms Road; one in the back, a sliding glass door, to the dining room; and one downstairs in the back to the furnace room. The furnace room,[3] which is at ground level, opens into the playroom. The furnace room door is a "brown wood solid door" which is actually half glass and half wood, and to its outside there is another door, a storm door with "all glass outside." Hillman left her home at 10:30 a.m. on January 8, 1980, to keep an 11 a.m. dental appointment. Prior to leaving she had secured or locked the entrances to her home "very carefully."

After going to the dentist and doing some marketing, she returned to her home at 12:30 p.m. When she did so, she saw a yellow automobile parked in her driveway[4] and she parked her automobile directly behind it. Thinking the yellow automobile belonged to a peddler "in front or back of the house," she "tooted" her horn twice. She had not given anyone the authority to enter her home that day. The yellow vehicle was "fairly close" to the garage. Because she parked as she did, there was "no way" that the yellow vehicle could get out of her driveway.

---

[3] The furnace room is downstairs with reference to the dining room.

[4] The driveway to the Hillman residence was "no more than seventy feet" long.

When no one had answered the "tooting" of her horn, Hillman used her automatic garage door opener to open the garage, went into the playroom and put her packages down. She came out of the playroom, went around to the back of the house and observed that her dining room door, which she never used, was open. She then looked down at the playroom, and she saw that the storm door was open and that the glass part of the door to the furnace room was smashed. That windowpane in the furnace room door had not been broken when she left that morning; she had been down there and would have seen it. She ran out, stopped a passing car and asked the driver to call the police because her house had been "broken into." She then went to her neighbor's house and asked that the neighbor call the police and then return to the house with her. Hillman said that the police arrived within a few minutes.

Westport police officer Richard Batten was sent to the Hillman residence by a radio report from police headquarters which he received at approximately 12:52 p.m. Arriving there about a minute later, he saw Hillman standing outside the house, and he also observed the two vehicles in the driveway. He parked so as to block the driveway, and inasmuch as the driveway itself had a tall wall entrance, the other two vehicles could not exit therefrom. After talking with Hillman, who told him that the yellow vehicle was not hers, he walked down to it, felt the hood, which he found to be warm, and noted that there was no key in the ignition. Batten then went to the north side of the house where he found a broken window in the furnace room door. He thereupon radioed his unit of a possible burglary in progress and also reported the registration of the yellow vehicle in the driveway. Shortly thereafter, he received certain registration information from headquarters by radio, which disclosed, inter alia, that the yellow motor

vehicle (a yellow and black two-door Oldsmobile Cutlass) was registered to Lucille Little of Bridgeport.[5]

Dispatched to the Hillman residence by a radio call, Westport police officer Michael J. Guman, Jr., arrived there at approximately 12:55 p.m. He joined Batten, and the two officers then searched the house. They found a broken window in the furnace room door. The piece of molding that held the windowpane had been "broken out." There was what appeared to be a tool mark in this molding that indicated that it was pried out with a tool. This door, which is a wooden door with windowpanes in the upper half, is secured by a lock mechanism built into the doorknob. The broken pane of glass was the one nearest to the doorknob. The door could be opened by reaching in through the broken window and unlocking the door from the inside.

The police search of the house disclosed that no one was inside at that time. The sliding glass door in the dining room, however, was open. In the master bedroom, which was above the garage, dresser drawers were found open, some items were strewn on the floor, and there was an open box on top of the dresser. Hillman was unable to say whether that room was in that condition when she left the house that morning. Nothing, however, was taken. Batten and Guman then also searched the area and found no one.

On the day of this incident, Westport police officers Wayne Dolinski and Gary Tranberg, both in plain clothes, were in an unmarked police patrol car traveling on the Connecticut Turnpike. Dolinski was driving. At approximately 12:52 p.m., they received a radio transmission from headquarters that there was a burglary in progress at the Hillman home. At that time,

[5] The application for the registration of the yellow and black two door Oldsmobile Cutlass bearing Connecticut registration LE 3711, which was admitted as a state's exhibit at the trial, showed the co-owner's signature, i.e., Charles Little, crossed out.

they were about three miles west of that location. While proceeding toward the Hillman home, they received information over the radio that the yellow car bearing Connecticut registration LE 3711 was registered to Lucille Little. Prior to January 8, 1980, Tranberg knew that Charles Little was the son of Lucille Little.[6] As they were proceeding, Dolinski saw an individual running and hitchhiking on the westbound side of the turnpike. He recognized that person as Charles Little. The officers reversed their direction, proceeded westbound and stopped their car near the defendant. Both officers exited the car and identified themselves as police officers. At that time, the hitchhiker was asked for his name and he replied, "Charles Little." He was arrested, given his *Miranda* rights, handcuffed and pat-searched. On the search, a set of keys,[7] a pair of gloves[8] and a wallet were taken from his person. The point at which the officers arrested the defendant was approximately 1300 feet southwest of the Hillman residence "as the crow flies."[9] Only "a few minutes" elapsed from the time that Dolinski and Tranberg had received the first radio transmission until the defendant was arrested on the turnpike. He was placed in the police car which proceeded to the Hillman residence.

Upon their arrival,[10] Dolinski, using the keys that had been taken from the defendant, opened the trunk of the yellow Oldsmobile and also started the ignition with

---

[6] At the trial a certified copy of the birth certificate of Charles Little, Jr., was admitted as a full exhibit. It demonstrated that his father was Charles Little, Sr., and that his mother was Lucille Biker.

[7] The set of keys taken from the defendant was admitted into evidence as an exhibit.

[8] A pair of thin leather-like gloves were admitted into evidence as an exhibit. No fingerprint impressions were taken at the scene.

[9] This distance was also referred to as "approximately a quarter [of a] mile."

[10] There was evidence that approximately seven minutes "had elapsed from the time the Dolinski-Tranberg patrol car received the original call to proceed to the Hillman house until they actually arrived at that place."

another key. Dolinski entered the house through the furnace room door, which he found had been "forcibly entered," and quickly scanned all the rooms. After coming back outside, Dolinski asked the defendant if he could drive the yellow Oldsmobile to police headquarters, and the defendant indicated that he could do so. This car was driven to headquarters and eventually released to Lucille Little, the defendant's mother.

"In determining whether the evidence is sufficient to sustain a verdict, we have said that ' "the issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. . . . [T]he evidence presented at trial must be given a construction most favorable to sustaining the jury's verdict." ' *State* v. *Giguere,* 184 Conn. 400, 402–403, 439 A.2d 1040 (1981); see *Jackson* v. *Virginia,* 443 U.S. 307, 318–19, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979); *State* v. *Kish,* 186 Conn. 757, 767, 443 A.2d 1274 (1982). 'Each essential element of the crime charged must be established by proof beyond a reasonable doubt'; *State* v. *Stankowski,* 184 Conn. 121, 126, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); and ' "although it is within the province of the jury to draw reasonable logical inferences from the facts proven, they may not resort to speculation and conjecture." ' *State* v. *Gaynor,* 182 Conn. 501, 503, 438 A.2d 749 (1980)." *State* v. *Gabriel,* 192 Conn. 405, 421–22, 473 A.2d 300 (1984). " ' "A conclusion of guilt requires proof beyond a reasonable doubt, and proof to that extent is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other rational conclusion." *State* v. *Foord,*

142 Conn. 285, 295, 113 A.2d 591 [1955]; *State* v. *Kelsey,* 160 Conn. 551, 553, 274 A.2d 151 [1970]; *State* v. *Reid,* 154 Conn. 37, 40, 221 A.2d 258 [1966]; *State* v. *Annunziato,* 145 Conn. 124, 136, 139 A.2d 612 [1958].' *State* v. *Mayell,* [163 Conn. 419, 427–28, 311 A.2d 60 (1972)]." *State* v. *Payne,* 186 Conn. 179, 184, 440 A.2d 280 (1982). " 'But the requirement of proof beyond a reasonable doubt does not mean that the proof must be beyond a possible doubt, and a possible hypothesis or supposition of innocence is far different from a reasonable supposition.' (Citations omitted.) *State* v. *Foord,* supra, 294–95; see *State* v. *Payne,* [supra] . . . . 'Emphasis needs to be placed on the distinction between the word "reasonable" and the word "possible." . . . Proof of guilt must exclude every reasonable supposition of innocence. . . . "[A] mere 'possible hypothesis' of innocence will not suffice." ' (Citations omitted.) *State* v. *Englehart,* 158 Conn. 117, 121–22, 256 A.2d 231 (1969)." *State* v. *Morrill,* 193 Conn. 602, 611, 478 A.2d 994 (1984); see *State* v. *Foord,* supra, 295; *State* v. *McDonough,* 129 Conn. 483, 485, 29 A.2d 582 (1942). While proof of guilt must exclude every reasonable supposition of innocence, it need not exclude every possible supposition of innocence. *State* v. *Englehart,* supra, 121.

We start our analysis recognizing that to obtain a conviction of burglary in the third degree the state was required to prove beyond a reasonable doubt that the defendant had unlawfully entered a building, namely the Hillman residence, with the intent to commit a crime therein. General Statutes § 53a-103 (a). Considering the evidence in the light most favorable to the state, we hold that the state has discharged its burden and that the jury could reasonably have concluded as it did on the evidence.

At the outset, we acknowledge the importance of circumstantial evidence in this case. "There is no legal distinction between direct and circumstantial evidence so far as probative force is concerned." *State* v. *Cari*, 163 Conn. 174, 179, 303 A.2d 7 (1972); see also *State* v. *Heinz*, 193 Conn. 612, 625, 480 A.2d 452 (1984); *State* v. *Gonzalez*, 176 Conn. 299, 300, 407 A.2d 968 (1978); *State* v. *Beauton*, 170 Conn. 234, 238, 365 A.2d 1105 (1976). The "process of inference is peculiarly a jury function, the raison d'etre of the jury system." *Pierce* v. *Albanese*, 144 Conn. 241, 256, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21 (1957); see also *State* v. *Tatem*, 194 Conn. 594, 483 A.2d 1087 (1984). It is within the province of the trier of fact to draw reasonable and logical inferences from the facts proven, but it may not resort to speculation and conjecture. *State* v. *Kish*, 186 Conn. 757, 768, 443 A.2d 1274 (1982); *State* v. *Tucker*, 181 Conn. 406, 418, 435 A.2d 986 (1980). Any inferences drawn must be rational and founded upon the evidence. *State* v. *Clemons*, 168 Conn. 395, 401, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975). The jury may base an inference on facts it finds as the result of other inferences. *State* v. *Gabriel*, supra, 425; *State* v. *McGinnis*, 158 Conn. 124, 130, 256 A.2d 241 (1969); *State* v. *Gonski*, 155 Conn. 463, 468, 232 A.2d 483 (1967); *State* v. *Hayes*, 127 Conn. 543, 555, 18 A.2d 895 (1941). In reviewing inferences which the jury drew, our inquiry "is directed to whether, on the facts established and the inferences reasonably to be drawn therefrom, the verdict can be supported." *State* v. *Avcollie*, 178 Conn. 450, 470, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980); *State* v. *Benton*, 161 Conn. 404, 410, 288 A.2d 411 (1971); *State* v. *Hayes*, supra. With the cumulative effect of the evidence and the permissible inferences for its consideration, the jury verdict must stand.

In reviewing the jury verdict, it is well to remember that "[j]urors are not 'expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct.' " (Citations omitted.) *State* v. *Scielzo,* 190 Conn. 191, 198 n.11, 460 A.2d 951 (1983), quoting *Frankovitch* v. *Burton,* 185 Conn. 14, 22, 440 A.2d 254 (1981). Someone had made a forceful entry into this residence; a glass pane of a rear door had been broken, and an outer storm door and a previously locked dining room door were found open.[11] No one had authorization that day to enter the home, nor did the homeowner expect any visitors that morning or early afternoon. A yellow Oldsmobile registered to the defendant's mother was found parked in the seventy foot driveway close to the house when Hillman arrived home. No emergency breakdown appeared to exist since that vehicle was fully operational as was shown when it started up immediately with keys taken from the defendant upon his arrest and then was driven to the police station. When he was identified and apprehended by the police, the defendant was located only 1300 feet from the residence. On the turnpike, the defendant, who had been running and hitchhiking in a westerly direction, away from the scene, admitted his identity to the apprehending officers. Cumulatively, this testimony not only reasonably puts him at the house about the time of the break-in, but also justifies a permissive inference of flight therefrom. The forcible entry into

[11] While " '[a]ny penetration, however slight,' " into the building by the defendant would constitute a sufficient entry; *State* v. *Smith,* 156 Conn. 378, 382, 242 A.2d 763 (1968); we have not required direct evidence of such penetration to satisfy the entry element of a burglary crime. Id., 381–82. The opening of the previously locked dining room door allowed the jury to infer that it had been opened by the defendant from inside, something he could not have accomplished without entering the house.

the house through the furnace room door as well as the previously locked, but now unexplainedly opened, rear dining room door, under all the circumstances justifies an inference that it was the defendant who entered the house to commit a crime. That presence was, of course, not only unauthorized, but unlawful.

Generally, intent can only be proved by circumstantial evidence, and, being a mental state, it is proved by the conduct of that person whose conduct is being scrutinized. *State* v. *Morrill,* supra, 609; *State* v. *Stankowski,* 184 Conn. 121, 127, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); *State* v. *Sober,* 166 Conn. 81, 92–93, 347 A.2d 61 (1974). The time, manner and forcible nature of the entry permitted a reasonable inference, based on human experience, that the unlawful entry by the defendant was hardly without purpose, but rather was with the intent to commit a crime therein. Such an inference is aided by the factor of his flight from the premises away from a fully operational car which had a warm hood and for which he had the keys. The unexplained flight of a person, accused of a crime, is one circumstance which, when considered with all the circumstances of the case, may justify an inference of his guilt. *State* v. *Grant,* 177 Conn. 140, 145, 411 A.2d 917 (1979); *State* v. *Rosa,* 170 Conn. 417, 432–33, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976); *State* v. *Beaulieu,* 164 Conn. 620, 632, 325 A.2d 263 (1973); 2 Wigmore, Evidence (3d Ed.) § 276; McCormick, Evidence (2d Ed.) § 271 (c). The circumstance that no crime was in fact proven to have been committed inside the Hillman home cannot vitiate the guilty verdict. This is so because the crime proscribed by § 53a-103 (a) is complete once there has been an unlawful entering or remaining in a building with the intent to commit a crime in that building. Where, for example, the claim is that the crime

intended to be committed by the burglar was larceny, the fact that there is no actual larceny does not bar a conviction for burglary. *State* v. *Benton,* supra, 411; see *People* v. *Johnson,* 28 Ill. 2d 441, 443, 192 N.E.2d 864 (1963); 12A C.J.S., Burglary § 42. The larceny, if committed, is a separate and distinct offense. *State* v. *Benton,* supra; *Wilson* v. *State,* 24 Conn. 57, 65 (1855).

The due process clause of the fourteenth amendment protects an "accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *DelVecchio,* 191 Conn. 412, 419, 464 A.2d 813 (1983); *State* v. *Roque,* 190 Conn. 143, 157, 460 A.2d 26 (1983). "An inference that a necessary element of the crime has been proved from proof of another fact, however, does not offend the requirements of due process if the underlying fact is proven beyond a reasonable doubt and is rationally related to the element of the crime." *Washington* v. *Harris,* 502 F. Sup. 1267, 1272 (S.D.N.Y. 1980), vacated on other grounds, 650 F.2d 447 (2d Cir. 1981), cert. denied, 455 U.S. 951, 102 S. Ct. 1455, 71 L. Ed. 2d 666 (1982). This is so because the due process requirement is met where there is a rational relationship between a fact proved and a fact to be inferred. See, e.g., *State* v. *Barr,* 259 N.W.2d 841, 842 (Iowa 1977). A careful review of the evidence demonstrates that there was sufficient evidence to support the jury's verdict; the crime charged was proven beyond a reasonable doubt. That review also shows that there is no reasonable supposition or hypothesis of the innocence of the defendant. *State* v. *Morrill,* supra, 611.

There is no error.

In this opinion the other judges concurred.