STATE OF CONNECTICUT *v.* CORNELIUS FLOWERS
(AC 23480)

Dranginis, Flynn and DiPentima, Js.

Argued January 21—officially released October 26, 2004

*William B. Westcott*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Patrick J. Griffin*, assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Cornelius Flowers, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2).[1] On appeal, the defendant raises the following claims: (1) there was insufficient evidence to convict him of burglary; (2) his burglary conviction is inconsistent with the jury's inability to reach a verdict on two charges of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1) and (4); (3) it was improper for the trial court to fail to conduct sua sponte an inquiry to determine if there was juror misconduct; and (4) the court improperly charged the jury. We affirm the judgment of the trial court.

The state charged the defendant in a three count, long form information. The first count of the information

[1] The trial court declared a mistrial on the second and third counts of the information, which alleged attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (4) in the second count, and §§ 53a-49 (a) (2) and 53a-59 (a) (1) in the third count.

charged that the defendant committed the crime of burglary in the first degree in violation of § 53a-101 (a) (2)[2] on August 5, 2000, at approximately 3 a.m. at 163-4 Mark Lane in Waterbury. Specifically, the state alleged that the defendant entered "unlawfully in a building *with intent to commit a crime therein* and in the course of committing the offense, he intentionally inflicted or attempted to inflict *bodily injury* on [Stephen] Alseph . . . ." (Emphasis added.)

In the second count of the information, the state accused the defendant of attempt to commit assault in the first degree in violation of §§ 53a-49 (a) (2) and 53a-59 (a) (4). Specifically, the state alleged that the defendant entered 163-4 Mark Lane at 3 a.m. *"with intent to cause serious physical injury* to another person and *while aided by two other persons* actually present, intentionally did an act which under the circumstances as he believed them to be, constituted a substantial step in a course of conduct planned to culminate in an assault in the first degree" by attempting "to cause serious physical injury to Stephen Alseph while aided by two other persons who were actually present . . . ." (Emphasis added.)

In the third count of the information, the state accused the defendant of attempt to commit assault in the first degree in violation of §§ 53a-49 (a) (2) and 53a-59 (a) (1).[3] The third count alleged that the defendant

[2] General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building *with intent to commit a crime* therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone." (Emphasis added.)

[3] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, *acting with the kind of mental state required for commission of the crime,* he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." (Emphasis added.)

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With *intent to cause serious physical*

entered 163-4 Mark Lane at about 3 a.m. "with *intent to cause serious physical injury* to another person *by means of a dangerous instrument* [and] did an act which under the circumstances as he believed them to be, constituted a substantial step in a course of conduct planned to culminate in an assault in the first degree" by attempting "to cause serious physical injury by means of a dangerous instrument to Stephen Alseph." (Emphasis added.)

The jury heard the following evidence from which it reasonably could have inferred that the defendant was guilty of burglary in the first degree. On the night of August 4, 2000, the defendant went to the Malibu Club (club) in Waterbury, as did Stephen Alseph. Sometime later, Alseph's wife, Keisha Alseph, arrived at the club with her friends, Chantel Paris and Tierra Mourning. At closing time, approximately 2 a.m. on August 5, 2000, Stephen Alseph had an argument with Paris and Mourning in the parking lot of the club. Keisha Alseph left the club in the company of Paris and Mourning. Stephen Alseph left the club alone.

Keisha Alseph and her friends arrived at the parking lot adjacent to the apartment at 163-4 Mark Lane about the same time Stephen Alseph did. Another argument ensued, and Paris struck Stephen Alseph on the head with a beer bottle, causing a small cut. Paris and Mourning got into their vehicle and left. The Alsephs entered their apartment and prepared for bed.

Approximately thirty minutes later, they heard a loud bang at the front door. Three men entered the bedroom and assaulted Stephen Alseph. One of the men struck him on the head with a lamp, causing him to fall onto

*injury to another person,* he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . (4) with intent to cause serious physical injury to another person and while aided by two or more other persons actually present, he causes such injury to such person or to a third person . . . ." (Emphasis added.)

the bed, bleeding. Keisha Alseph attempted to protect her husband as the three men continued to beat him. After making reference to "some girl," the three men left the apartment. Stephen Alseph grabbed a knife and chased them. The men saw him, and one of them said, "He's coming back for more." When they saw the knife, the men got into an automobile and sped away. Stephen Alseph chased the vehicle on foot for a distance, and he saw Paris and Mourning driving away from the scene.

Stephen Alseph returned to his apartment where his wife was waiting. The police arrived about five minutes later. The police found Stephen Alseph bleeding from the arms, face and head. Keisha Alseph had cuts on her stomach and arms. Stephen Alseph was taken to St. Mary's Hospital where he received sutures for his head wound. Keisha Alseph informed the police that the defendant was one of the three assailants. She recognized him because he had worked with one of her cousins at a McDonald's restaurant. She also implicated Paris and Mourning.

A short while later, the police received a telephone call from Victoria Vasquez, the defendant's former girlfriend. Vasquez informed the police that at approximately 2:45 a.m., she began receiving telephone calls from the defendant. She said that he had called and immediately hung up. Vasquez stopped answering the telephone, and the defendant left messages on her answering machine to "stop playing games" because he was "in trouble and needed her help." The defendant arrived at Vasquez' home about fifteen minutes later. Vasquez refused to let the defendant inside because she was afraid of him and had a protective order against him. The defendant left. Vasquez informed the police that she thought that the defendant had returned to an address on Wall Street from which his telephone calls had originated.

The police went to 72 Wall Street and found the defendant and his cousin, Devon Hicks, hiding under a bed in the first floor apartment. The defendant identified himself as Thomas Flowers.[4] The police separately transported Keisha Alseph and Stephen Alseph to the Wall Street apartment to identify the two men who had been found hiding there. Keisha Alseph and Stephen Alseph identified the defendant and Hicks as two of the men who had assaulted them that night.[5] They did not waver in their identification of the defendant, whom they also identified at trial. The defendant was arrested.

A few days after his arrest, the defendant met with Vasquez at a commuter parking lot in Cheshire with assistance from Hicks. The defendant wanted to know why Vasquez had called the police. The defendant and Vasquez met again on February 13, 2001, the day before Vasquez was to report to the office of the state's attorney pursuant to a subpoena issued in the case against Hicks. The defendant asked Vasquez to lie for him, to tell the police that he was on foot that night and that he was with her at the time of the burglary. Vasquez initially agreed to the defendant's request because she was trying to work things out with him for the sake of their child. Five months later, however, Vasquez told the prosecutor that the defendant had come to her house in a light colored automobile and that he had not been with her earlier that evening. The defendant subsequently telephoned Vasquez and threatened her not to testify against him.

The defendant testified at trial to establish his alibi that he was not present during the break-in. He testified that he had been at the club on the night in question

---

[4] Thomas Flowers, the name the defendant gave to police, is the name of his uncle.

[5] Subsequently, Keisha Alseph and Stephen Alseph also identified the third assailant, Arthur Trent, from an array of photographs. Trent is the father of Mourning's child and also is another of the defendant's cousins.

and had witnessed a disturbance in the parking lot. According to the defendant, someone had sprayed Mace, which got into his eyes. He and Hicks then went to the home of his friend, Stephen Gyadu, located at 72 Wall Street, to wash his face. He telephoned Vasquez to ask her for a ride because Hicks had fallen asleep. Because Vasquez would not talk to him, he walked to her house. He walked back to Wall Street and lay down on the floor next to Hicks' bed. The defendant denied assaulting Stephen Alseph and also denied giving the police a false name.

The jury found the defendant guilty of burglary in the first degree. After the court sentenced the defendant to fifteen years in prison, execution suspended after six years, with five years of probation, the defendant appealed.[6]

I

The defendant first claims, on the basis of an unsigned note written by one of the jurors (sixth juror), that there was insufficient evidence to convict him of burglary in the first degree and that the conviction therefore is violative of the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut. Specifically, the defendant argues that if the sixth juror did not find that he intended to commit the offenses alleged in counts two and three, that juror could not have concluded that the state had proved all the elements of the burglary charge. In other words, as the defendant argues, "the intent necessary to support a finding of guilty for burglary is legally indistinguishable from the intent which the juror specifically stated to be unproven with regard to counts two and three." We do not agree.

---

[6] The defendant filed a motion for a judgment of acquittal or for a new trial, which was denied.

The defendant has based his claim on the following incident that occurred at trial. While the jury was deliberating, a number of notes were sent to the court. On the second day of deliberations, the foreperson signed a note, stating: "We have a problem. We voted for each case. Five of us, all the same, voted the same for all three accounts. There is one of us who is not changing his/her mind for anything. What do we do?" The court responded with a supplemental instruction to the jury pursuant to *State* v. *Smith*, 49 Conn. 376 (1881) ("Chip Smith" charge).

The next day, the court received an unsigned note from the sixth juror bearing the heading, "dissenting opinion/position . . . ." The note stated in relevant part: "I believe the witness (Steve A.) is not credible, and therefore the quality of his testimony is of zero quality. I believe that (Keisha A.) testimony is credible but her statements concerning [the defendant's] involvement were conflicting, at best. She stated at one point that she did not see/know of [the defendant] strike herself or Steve A. The prosecution did not present a credible witness that specifically stated that [the defendant] held, pulled hair, used a lamp, offered verbal encouragement to others alleged; any of which would support establishing 'intent.' No physical evidence linking [the defendant]. My stance: count #1 burglary w/ intent . . . guilty [and] counts #2 & #3 . . . not guilty. My decision is final. I've thought about it long, and I don't need to hear any further about the matter, nor should I be part of any more questioning related to his alleged presence at the scene. Mere presence does not make one an accessory. I *cannot* be moved on this. I will be yelled at no more by the foreman." (Emphasis in original.)

The foreperson then sent the court two more notes that she had signed. The first note informed the court that the other five members of the jury wanted the court

to know that they had no knowledge of the contents of the note written by the sixth juror and that the foreperson would not sign the note or give it to the court. The second note informed the court that the jury had reached a unanimous verdict of guilty on the first count, burglary in the first degree.

At the court's direction, the jury entered the courtroom and announced its verdict. The court asked the clerk to poll the jurors individually. Each juror stated that the defendant was guilty of burglary in the first degree. The court accepted the verdict, declared a mistrial on the second and third counts of the information and excused the jury.

At this time, the defendant asked the court to set aside his burglary conviction because the jury had not found him guilty of the underlying offenses. The state argued that pursuant to the allegations in the information, it did not have to prove that the defendant committed an underlying crime, but merely that he had the intent to commit a crime when he entered the building.[7] We agree with the state.

The standards by which we review claims of insufficient evidence are well established. "When reviewing a sufficiency of the evidence claim, our courts apply a two-prong[ed] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State v. Feliciano*, 74 Conn. App. 391, 395, 812 A.2d 141 (2002), cert. denied, 262 Conn. 952, 817 A.2d 110 (2003).

---

[7] The state's theory of the case was that the defendant and his accomplices broke into the victim's apartment with the intent to commit a complete assault.

On appeal, the defendant argues that because the sixth juror could not find him guilty of attempt to commit assault because of the lack of intent, the defendant could not be guilty of the burglary charge because the underlying offense for a burglary charge cannot be an inchoate offense. The defendant provides no legal authority for his argument.[8] The defendant acknowledges, however, the rule that the fact that no underlying crime has occurred does not bar a conviction for burglary. See *State* v. *Little*, 194 Conn. 665, 676, 485 A.2d 913 (1984). The crime of burglary is complete once there has been an unlawful entering or remaining in a building with the intent to commit a crime in that building. Merely crossing the plane of the entrance is sufficient. "The time, manner and forcible nature of the entry permitted a reasonable inference, based on human experience, that the unlawful entry by the defendant was hardly without purpose, but rather was with the intent to commit a crime therein." Id., 675. If a defendant changes his mind after entering a building and does not, in fact, commit the intended crime, a burglary has occurred nonetheless.

On the basis of our review of the record, we conclude that there was sufficient evidence before the jury to demonstrate that the defendant was one of three people who broke into the victims' apartment during the early morning hours of August 5, 2000, intending to assault Stephen Alseph. The defendant was in the company of two men, both of whom were his cousins and one of whom had fathered a child with Mourning, who had argued with Stephen Alseph earlier that morning. The burglars assaulted the victims in their bedroom and

---

[8] The defendant claims that he is not aware of any case where the underlying crime at issue in a burglary conviction is an inchoate crime. We are unmoved. See, e.g., *State* v. *Griffin*, 78 Conn. App. 646, 828 A.2d 651 (2003) (defendant convicted of burglary in first degree and attempt to commit assault in first degree).

inflicted injuries that required medical attention. When Stephen Alseph chased his assailants, he saw Paris and Mourning in a motor vehicle. This evidence was sufficient from which the jury could infer intent.

Furthermore, at about 2:45 a.m., the defendant telephoned Vasquez and left a message that he was in trouble and needed her help. Before Vasquez was to meet with the prosecutor, the defendant asked her to lie and to vouch for his whereabouts at the time of the burglary. After Vasquez returned to the prosecutor and recanted her statement, the defendant threatened her not to testify against him. This evidence was sufficient for the jury to infer a consciousness of guilt on the defendant's part.

"Generally, intent can only be proved by circumstantial evidence, and, being a mental state, it is proved by the conduct of that person whose conduct is being scrutinized." Id. "There is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. . . . The process of inference is peculiarly a jury function, the raison d'etre of the jury system." (Citations omitted; internal quotation marks omitted.) Id., 673. This court does not sit as a seventh juror to cast a deciding vote. "We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. . . . The scope of our factual inquiry on appeal is limited. This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Nicholson*, 71 Conn. App. 585, 590, 803 A.2d 391, cert. denied, 261 Conn. 941, 808 A.2d 1134 (2002).

As in every criminal case, the state has the burden to prove that the defendant had the requisite intent to commit each of the crimes alleged. Intent is specific to each crime. The intent element of the crimes of burglary

and attempt to commit assault in the first degree are not the same. The intent required for burglary in the first degree is "intent to commit a crime" in a building. See General Statutes § 53a-101 (a). "To be guilty of the crime of attempt to commit assault in the first degree, the defendant must have had the specific intent to commit the crime. General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) [(1) and (4)]. Thus, the defendant must be shown to have had the mental state required to commit assault in the first degree." *State* v. *Griffin*, 78 Conn. App. 646, 653, 828 A.2d 651 (2003). Subdivisions (1) and (4) of § 53a-59 (a) require the actor to have the intent to cause serious physical injury. We conclude, therefore, that the defendant's argument is without legal basis in its assertion that the intent necessary to commit burglary and to commit the crime of attempt to commit assault in the first degree is legally indistinguishable. Consequently, it was logical that the sixth juror was able to find the defendant guilty of burglary in the first degree, but not attempt to commit assault in the first degree, given the inferences the juror drew from the facts proved.

For the reasons stated, we conclude that there was sufficient evidence from which the jury reasonably could have found the defendant guilty of the crime of burglary in the first degree, that is, unlawfully entering a building with intent to commit a crime therein.

## II

The defendant's second claim is that the burglary conviction is inconsistent with the jury's inability to reach a verdict on the charges of attempt to commit assault, and that this claimed inconsistency violated his rights under the sixth and fourteenth amendments to the federal constitution and article first, § 8, of the constitution of Connecticut.[9] We disagree.

---

[9] We cannot discern any constitutional analysis, either federal or state, in the defendant's brief. We therefore will confine our review to the common-law arguments that he made.

"The issue of legal inconsistency typically arises when a defendant is convicted of two offenses that contain contradictory elements." *State* v. *Milner*, 46 Conn. App. 118, 122, 699 A.2d 1022 (1997). "To determine whether a jury verdict is legally inconsistent, we look carefully to determine whether the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted. If that is the case, the verdicts are legally inconsistent and cannot withstand challenge." (Internal quotation marks omitted.) *State* v. *Robinson*, 81 Conn. App. 26, 35–36, 838 A.2d 243, cert. denied, 268 Conn. 921, 846 A.2d 882 (2004). The resolution of a claim of inconsistent verdicts presents a question of law. *State* v. *Milner*, supra, 122. Our review is therefore plenary.

Here, the defendant was convicted of burglary in the first degree, and the jury was unable to reach a verdict on the charges of attempt to commit assault. "[W]here the inconsistent verdicts claim involves a simultaneous conviction and acquittal on different offenses, the court, in testing the verdict of guilty for inconsistency as a matter of law, is necessarily limited to an examination of the offense charged in the information and the verdict rendered thereon without regard to what evidence the jury had for consideration. . . . If the offenses charged contain different elements, then a conviction of one offense is not inconsistent on its face with an acquittal of the other." (Citation omitted; internal quotation marks omitted.) Id., 122–23. The defendant does not argue that the elements of the various crimes are similar. His argument pertains to the jury's finding that he had the requisite intent to commit burglary in the first degree and the sixth juror's inability to find that he had the requisite intent to commit the crime of attempt to commit assault in the first degree. The defendant's

argument misses its mark because this result is not legally inconsistent or impossible.

As we discussed in part I, the crime of burglary in the first degree requires only that a person unlawfully enter a building with the intent to commit a crime therein. The two counts of attempt to commit assault each require the actor to intend to cause *serious physical injury*. The jury could have concluded that the defendant had the intent to commit a crime in the building when he entered it illegally, but that he did not have the intent to cause serious physical injury or that he changed his mind after he got into the building. This conviction is consistent with the state's theory of the case that at the time the defendant and his accomplices broke into the victims' apartment, he intended to assault Stephen Alseph. For whatever reason, perhaps the strength of the evidence it had, the state charged the defendant in separate counts with merely attempt to commit assault in the first degree. There is nothing legally inconsistent or impossible about the outcome of this trial, as the intent necessary to convict the defendant of burglary is different from the intent necessary to convict him of the charges of attempt to commit assault.

## III

The defendant's third claim is that the court violated the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut by failing to inquire sua sponte into potential juror misconduct. Specifically, the defendant argues that the jury's verdict was the result of an impermissible compromise. We are unpersuaded.

"A court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality." *State* v. *Camera*, 81 Conn. App. 175, 180, 839 A.2d 613, cert. denied, 268 Conn. 910, 845 A.2d

412 (2004). "Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . Consideration [by the jury] of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, 235 Conn. 502, 522–23, 668 A.2d 1288 (1995) (en banc).

The defendant claims that he was denied the constitutional right to an impartial jury because the burglary verdict was the result of a compromise. "[A] verdict which is reached only by the surrender of conscientious convictions upon one material issue by some jurors in return for a relinquishment by others of their like settled opinion upon another issue and the result of one which does not command the approval of the whole panel, is a compromise verdict founded on conduct subversive of the soundness of trial by jury." (Internal quotation marks omitted.) *McNamee* v. *Woodbury Congregation of Jehovah's Witnesses*, 194 Conn. 645, 647–48, 484 A.2d 940 (1984).

The unusual facts concerning the jury's deliberations indicate that there was no compromise verdict. The foreperson sent the court a note explaining that the jury was deadlocked on some of the charges. The court gave the jury a "Chip Smith" instruction. Thereafter, an unsigned note was sent to the court. The note indicated that the sixth juror was not going to agree with the other five jurors that the defendant was guilty of the

attempt to commit assault charges. The author of the note, however, believed that the defendant was guilty of burglary. Thereafter, two more notes were sent to the court. The first indicated that five of the jurors, including the foreperson, did not know the contents of the sixth juror's note. In the second note, the foreperson informed the court that the jury had reached a verdict on one of the counts but not on the other two. The court took the jury's verdict and had the jurors polled individually. The jurors individually stated that they had found the defendant guilty of burglary in the first degree.

As we explained in parts I and II, there is nothing inconsistent about the fact that the jury found the defendant guilty of burglary in the first degree, but could not agree that he had the requisite intent to commit the crime of attempt to commit assault in the first degree. The court was aware of the conflict among the jurors with respect to the second and third counts of the information. Although it is highly unusual for a member of the jury to send an unsigned message to the court, there is nothing in the facts of this case to indicate that the court should have investigated sua sponte the conflict among the jurors. Indeed, the facts of this case speak loudly that there was no compromise verdict because there was no agreement among the jurors as to the charges of attempt to commit assault. The sixth juror made it eminently clear that she or he was not going to be persuaded by the remaining members of the panel. The jury system worked, and the court properly declared a mistrial as to the counts of attempt to commit assault in the first degree. We, conclude, therefore that there was no reason for the court to inquire as to juror misconduct.[10]

---

[10] The defendant also claimed that it was improper for the court to seal the note from the sixth juror. The defendant, however, has not identified an improper reason the court had for doing so and has failed to cite any law in support of his claim. We therefore consider the claim abandoned. See *State* v. *Johnson*, 82 Conn. App. 777, 790, 848 A.2d 526 (2004).

## IV

The defendant also claims that the court improperly instructed the jury that (1) reasonable doubt is not a doubt suggested by counsel that is not warranted by the evidence and (2) the state must prove unlawful entry into a building by the defendant with the intent to commit the crime of attempt to commit assault in the first degree, an inchoate crime.[11] We disagree with the defendant's claims.

We begin our review of the defendant's claims by setting forth the well known standards by which we review the court's instruction to the jury. "[J]ury instructions must be read as a whole and . . . are not to be judged in artificial isolation from the overall charge. . . . The whole charge must be considered from the standpoint of its effect on the jurors in guiding them to a proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . The instruction must be adapted to the issues and may not mislead the jury but should reasonably guide it in reaching a verdict. . . . We must review the charge as a whole to determine whether it was correct in law and sufficiently guided the jury on the issues presented at trial." (Internal quotation marks omitted.) *State* v. *Solek*, 66 Conn. App. 72, 87–88, 783 A.2d 1123, cert. denied, 258 Conn. 941, 786 A.2d 428 (2001).

"[I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citation

---

[11] Following oral argument in this court, we asked the parties to submit supplemental briefs on the second issue.

omitted; internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493, 510, 828 A.2d 1248 (2003).

"The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Therefore, jury instructions need not be exhaustive, perfect, or *technically accurate*. Nonetheless, the trial court must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict." (Emphasis added; internal quotation marks omitted.) *State* v. *Solek*, supra, 66 Conn. App. 88.

A

The defendant's first claim of instructional error is that the court, in reference to reasonable doubt, charged the jury that "[i]t is not a doubt suggested by counsel which is not warranted by the evidence." The defendant claims this sentence violates our Supreme Court's directive in *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 (1999), not to use the "ingenuity of counsel" instruction because it is the functional equivalent of the prohibited instruction. We are not convinced.

In *Delvalle*, our Supreme Court concluded that the instruction incorporating the phrase "ingenuity of counsel," as used by the trial court in the context of its entire charge, did not dilute the state's burden of proof.[12] Id., 474–75. "The phrase 'not warranted by the evidence' qualifies the 'ingenuity of counsel' language, and renders even more remote any possibility that the jury was

---

[12] The offending portion of the jury instruction in *Delvalle* was: "It is not a guess, a surmise or conjecture, *nor is it a doubt suggested by the ingenuity of counsel* or of a juror not warranted by the evidence." (Emphasis in original; internal quotation marks omitted.) *State* v. *Delvalle*, supra, 250 Conn. 474 n.11.

misled by the latter phrase. See *State* v. *Hines*, [243 Conn. 796, 819 n.18, 709 A.2d 522 (1998)] ('[T]he phrase "ingenuity of counsel" is immediately succeeded by the phrase "or by a juror and unwarranted by the evidence." Such language . . . indicate[s] to the jury that doubt may not be created by an argument of counsel or other jurors that is ingenious, but has no basis in the evidence. It is an accurate statement of the law to say that all findings of fact must be supported by the evidence.')" *State* v. *Delvalle*, supra, 475.

More recently, our Supreme Court in *State* v. *Betances*, supra, 265 Conn. 508–11, upheld identical language used by the court here. "The court instructed the jury, inter alia, that reasonable doubt is 'not a doubt suggested by counsel which is not warranted by the evidence.' The court's instruction included the qualifying language, 'which is not warranted by the evidence,' that saved the instruction in *Delvalle*. We conclude that the court's instructions, when read as a whole and not judged in artificial isolation from the overall charge, presented the case to the jury so that no injustice resulted and did not affect the fairness or integrity of the proceedings or result in a manifest injustice to the defendant." Id., 511.

For the reasons stated, we conclude that the court's instruction concerning reasonable doubt was not constitutionally infirm.

## B

The defendant's second claim of instructional error is that with respect to burglary, the court instructed the jury on a theory of liability that is not cognizable. More specifically, it was improper for the court to charge that the defendant entered the victims' apartment with the intent to commit attempt to commit assault, an inchoate crime. He claims that the theory of liability submitted to the jury required it to find that

he intended an unintentional result from his conduct, namely, intentionally to fail to accomplish a complete crime. On the basis of our review of the entire jury instruction, we conclude that the court's instruction with respect to burglary did not mislead the jury.

The following facts are relevant to our review of the defendant's claim. In its closing argument to the jury, the state argued that Keisha Alseph was of the opinion that her friends, Paris and Mourning, had set up the burglary and assault on her husband, Stephen Alseph. It also argued that when the defendant, Hicks and the third assailant, Arthur Trent, crossed the threshold of the victims' apartment, they had a community of purpose to assault Stephen Alseph. It argued in addition that the defendant and his accomplices had entered the apartment with one goal in mind: To inflict serious physical injury on Stephen Alseph. In his rebuttal argument, the defendant acknowledged the state's theory of the case: Paris and Mourning had asked the defendant, Hicks and Trent to assault Stephen Alseph. The state also concluded its rebuttal argument with a restatement of the community of purpose the defendant and his accomplices had on the night in question to assault Stephen Alseph.

We have examined the court's charge in its entirety and include its relevant portions here.[13] The first thing the court did was to tell the jury the crimes with which the defendant was charged: "There are three separate charges. Count one is burglary in the first degree in violation of . . . General Statutes § 53a-101 (a) (2) . . . . In support of that charge, the state alleges that on or about August 5 [2000], because it was three o'clock in the morning . . . at or near the address of— here, we're saying at the address of 163-4 Mark Lane

---

[13] The portions of the charge that the defendant challenged on appeal are italicized.

in Waterbury, that the defendant entered unlawfully—
and I'll define unlawfully for you—in a building . . .
I'll define that for you—to commit a crime therein, and
in the course of committing the offense, a crime, he
intentionally inflicted or attempted to inflict bodily
injury on Stephen Alseph."[14]

The court also instructed the jury on motive and
intent. "Motive. While motive is not an element of the
crime charged, such evidence is both desirable and
important, as it may strengthen the state's case if an
adequate motive can be shown. Therefore, an absence
of evidence of motive may tend to raise a reasonable
doubt of the guilt of the defendant. But a total lack of
evidence of motive does not necessarily raise a reason-
able doubt as long as there is other evidence produced
that is sufficient to prove guilt beyond a reasonable
doubt. Since it is impossible to look into someone's
mind to see what motivates him, a jury must infer such
a motive from the accused's conduct. The jury should
endeavor to determine on all of the evidence if it can
reasonably infer that the accused did have a motive to
commit the crime if the existence of a motive can be
reasonably inferred. If the absence of an apparent
motive does not raise a reasonable doubt that the
accused is guilty, then the mere fact that the state has
been unable to prove what the motive of the accused
actually was does not prevent the jury from rendering
a verdict of guilty. . . .

"Intent relates to the condition of mind of the person
who commits the act, his purpose in doing it. As defined
by our statute, a person acts intentionally with respect
to a result or to conduct when his conscious objective
is to cause such result or to engage in such conduct.
So, again, under our statute, a person acts intentionally
with respect to a result or to conduct when his con-

---

[14] The jury had the information during its deliberations.

scious objective is to cause such result or to engage in such conduct. What a person's purpose, intention or knowledge has been is usually a matter to be determined by inference. No person is able to testify that he looked into another person's mind and saw therein a certain purpose or intention or knowledge to do harm to another. The only way in which a jury can ordinarily determine what a person's purpose, intention or knowledge was at any given time, aside from that person's own statement or testimony, is by determining what that person's conduct was and what the circumstances were surrounding that conduct, and from that infer what his purpose or knowledge was. To draw such an inference is not only the privilege, but also the proper function of a jury provided, of course, that the inference drawn complies with the standards for inferences as explained in connection with my instruction on circumstantial evidence. There is no particular length of time necessary for the defendant to have formed intent. Intent can be formed instantaneously. . . .

"In count one—and I have to make sure I follow this information, this blueprint, which is what you're going to have to be careful to do—the defendant is charged with the crime of burglary in the first degree in violation of § 53a-101 of the Penal Code, which provides as follows: A person is guilty of burglary in the first degree when, as it applies in this case, he unlawfully enters—which I'll define for you—that is the first element—in a building—and I'll define building for you—with intent to commit a crime therein. And I previously defined intent for you. You are to recall and apply that definition. So, a person is guilty of burglary in the first degree when he unlawfully enters a building with the intent to commit a crime therein, and in the course of committing the offense, as it relates to this case, he intentionally inflicts or attempts to inflict bodily injury to another person. . . .

"For you to find the defendant guilty of the charge of burglary in the first degree, the state must prove the following elements beyond a reasonable doubt: That the defendant knowingly [made] an unlawful entry [and] entered the premises of 163-4 Mark Lane; that such premises constituted a building . . . and that the unlawful entry was affected or occurred with the defendant's intent to commit a crime in the building. *Here, the crime being attempted [was] assault in the first degree.* That is, in the course of committing the offense, the defendant intentionally inflicted or attempted to inflict bodily injury to someone . . . ." (Emphasis added.)

Following a sidebar conference, the court continued: "Such premises constituted a building . . . *that the unlawful entry was effected or occurred with the defendant's intent to commit a crime in that building, and I said that the specific crime is attempted assault;* and that in the course of committing that offense, the defendant intentionally inflicted or attempted to inflict bodily injury to a person, here being Stephen Alseph. . . .

"You must further determine whether the unlawful entry was effected or occurred with the defendant's intent to commit a crime in that building. And I previously defined intent for you, and you will recall that definition and apply it here. And I'll just say briefly that intent relates to the condition of mind of the person who commits the act, his purpose in doing it. A person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or engage in such conduct. So, you must further determine whether the unlawful entry was effected or occurred with the defendant's intent to commit a crime in that building, 163-4 Mark Lane. Furthermore, the necessary intent to commit a crime must be an intent to commit either a felony or a misdemeanor other than the crime

of burglary, and I charged you that as a matter of law, that the crimes charged fit this category. . . .

"For you to find the defendant guilty of burglary in the first degree, certain additional aggravating factors must be proven beyond a reasonable doubt. One of the aggravating factors exists if the state proves that the defendant, in the course of committing the offense, intentionally inflicted or attempted to inflict bodily injury to someone, here, Stephen Alseph. Bodily injury means impairment of physical condition or pain. The defendant need not have actually inflicted bodily injury on anyone as long as he attempted to inflict such injury on someone in the course of committing the crime— an act deemed to be in the course of an offense if it occurs in an attempt to commit the offense or flight after the attempt or commission." (Emphasis added.)

We note that the defendant did not take an exception to the court's charge or request a curative instruction. His claim on appeal, therefore, is unpreserved. The state correctly notes that the defendant's claim is reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as the record is adequate for our review and the claim is of a constitutional nature. We agree with the state, however, that the court's instruction did not rise to the level of a constitutional violation because it is not reasonably possible that the jury was misled or that an injustice has been done.

As we have often noted, jurors do not leave their common sense at the courthouse door. The state and the defendant agreed on the state's theory of the case: The defendant and his accomplices broke into the victims' apartment to assault Stephen Alseph to avenge Paris or Mourning. The information, which the jury had with it during deliberations, alleged that the defendant unlawfully entered the victims' apartment with the intent to commit a crime there. The purpose of a jury

instruction is to guide the jury's deliberation in accordance with the evidence. On the basis of the evidence and reviewing the instruction in its entirety, we conclude that the court's instruction accomplished that purpose, that the jury was not misled and that no injustice has been done. In fact, it seems more than clear that the jury as a whole was not misled because at least one of the jurors was able to differentiate the intent needed to commit the various crimes with which the defendant was charged.

The judgment is affirmed.

In this opinion DiPENTIMA, J., concurred.

FLYNN, J., dissenting. I respectfully disagree with part IV B of the majority opinion and would reverse the judgment of the trial court.

I agree with the defendant's argument that the court instructed the jury as to the charge of burglary in the first degree on a theory of criminal liability that is not cognizable. The claim involves the second element of burglary, namely, that the defendant must have intended to commit a crime in the building he unlawfully entered. See D. Borden & L. Orland, 5A Connecticut Practice Series: Criminal Jury Instructions (3d Ed. 2001) § 12.1, p. 292. In charging on this element of intent, the court instructed that the state must prove that the "unlawful entry was effected or occurred with the defendant's intent to commit a crime in that building and [the court stated that] *the specific crime is attempted assault . . . .*" (Emphasis added.) This statement was later reinforced when the court stated that "such premises constituted a building . . . that the unlawful entry was effected or occurred with the defendant's intent to commit a crime in that building, and *I said that the specific crime is attempted assault . . . .*" (Emphasis added.)

"As a general matter, [t]he jury is presumed, in the absence of an indication to the contrary, to have followed the instructions of the trial court." (Internal quotation marks omitted.) *State* v. *Vargas*, 80 Conn. App. 454, 468, 835 A.2d 503 (2003), cert. denied, 267 Conn. 913, 840 A.2d 1175 (2004). If the jury followed the judge's instructions, as it was supposed to do, then to convict the defendant of burglary in the first degree, it would had to have determined that he had intended to commit the inchoate crime of attempted assault. An "attempt" of a crime is accomplished "when a person intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." (Internal quotation marks omitted.) *State* v. *Gombert*, 80 Conn. App. 477, 495–96, 836 A.2d 437 (2003), cert. denied, 267 Conn. 915, 841 A.2d 220 (2004). The defendant also must have possessed the specific intent to commit the underlying crime. An attempt is an inchoate crime, meaning that it is unfinished or begun with the proper intent but not finished. By charging that the state had to prove that the defendant unlawfully entered the building with the intent to commit an attempted assault, the court, in effect, charged the jury that the defendant had to be proved to have unlawfully entered the premises intending only to attempt an assault but not to complete it. Thus, the defendant would have had no intent actually to commit the underlying crime of assault and, therefore, he did not enter the building with the intent to commit a crime.

The majority states that jurors do not leave their common sense at the courthouse door and that the jury should have been able to determine that it had to find that the defendant entered the building with the intent to commit the crime of assault, and not attempted assault as the court instructed. Although I note that the

defendant and the state agreed on the state's theory of the case and that the information stated that the defendant had to have possessed the intent to commit a crime within the building, I do not agree that the jury necessarily disregarded the court's instructions.[1] "[G]reater weight is likely to have been given by the jury to a later statement than to an earlier one; and this principle operates at times to cure an error in the earlier statement, but on the other hand, if the later instruction is erroneous, it is apt to result in a new trial. In fact error in a later statement has frequently been held not to have been cured by an earlier correct charge." W. Maltbie, Connecticut Appellate Procedure (2d Ed. 1957) § 95, p. 114. The last word the jury heard on the crime it had to find that the defendant had intended to commit was the court's charge that the specific crime was attempt to commit assault. This instruction was not just "inartful" as the majority claims, it did not charge conduct constituting a crime. Our standard of review is not whether the jury actually was misled, but only if it is reasonably possible that the jury was misled. Because the court charged the jury that it could convict the defendant of something that was not a crime and because the jury is presumed to have followed the instruction, I do not see how we can say that the jury could not reasonably have been misled and the defendant harmed. Therefore, I respectfully dissent.

---

[1] I note that the court specifically stated that "[i]t is exclusively the function of the court to state the rules of law that govern the case with instructions as to how you are to apply them. It is your obligation to accept the law as

I state it. You must follow all of my instructions and not single out some and ignore others. They are all equally important."