STATE OF CONNECTICUT *v.* LLOYD SMITH, JR.
(AC 25486)

Schaller, Bishop and Rogers, Js.

Argued September 29, 2006—officially released January 9, 2007

*Jodi Zils Gagne,* for the appellant (defendant).

*Leon F. Dalbec, Jr.,* senior assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's

attorney, and *Robin D. Cutuli*, assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Lloyd Smith, Jr., appeals from the judgments of conviction, rendered after a jury trial, of assault in the second degree in violation of General Statutes § 53a-60 (a) (2), kidnapping in the second degree in violation of General Statutes § 53a-94 (a), burglary in the third degree in violation of General Statutes § 53a-103 (a) and criminal violation of a protective order in violation of General Statutes (Rev. to 1999) § 53a-110b, now § 53a-223. On appeal, the defendant claims that (1) the trial court improperly admitted evidence of prior uncharged misconduct and (2) the evidence was insufficient to sustain his conviction of (a) assault in the second degree, (b) burglary in the third degree, (c) criminal violation of a protective order and (d) kidnapping in the second degree.[1] We affirm the judgments of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. The relationship between the defendant and Azra Agic, the victim, commenced on or about September, 1999, and continued for approximately one year. They first met when they were both employed at the Charter Oak Family Health Center in Hartford. Agic served as the center's refugee health coordinator and the defendant as a computer programmer assigned to implement a program to assist Agic in her duties. In or around December, 1999, or January, 2000, the defendant

---

[1] The defendant also claims that the court improperly granted the state's motion to consolidate into one trial the two criminal files in which he was charged. The defendant, however, consented to the state's motion to consolidate the two criminal files for a single trial. Thus, the defendant has waived review of this claim. See *State* v. *Gentile*, 75 Conn. App. 839, 847–48, 818 A.2d 88 (by affirmatively stating that he did not object, defendant waived review of claim on appeal), cert. denied, 263 Conn. 926, 823 A.2d 1218 (2003).

learned through their interactions at work that Agic was in the process of going through a divorce and was having a difficult time obtaining an apartment for herself and her daughter. As a result, the defendant volunteered his assistance in obtaining an apartment in New Britain for Agic and her daughter.

One night thereafter, Agic had a business related dinner with the defendant to discuss the computer program and its presentation. Agic testified that from that night she could remember only that she had had a glass of wine at the restaurant and that the following morning she woke up in the defendant's apartment, unaware of how she got there. The defendant was not there. She got dressed, went home and then to work.

A few days later, the defendant appeared at Agic's apartment and refused to leave. When Agic's daughter asked why he would not leave, the defendant loudly responded, "I paid for this month's rent. I'm going to stay here as long as I want to. I'm not going anywhere." According to Agic, "that's when everything started," referring to physical abuse by the defendant. That night, the defendant "was kicking me all over the place. . . . [H]e choke[d] me, and he kick[ed] me in my stomach, literally, all over the living room."

Agic testified that a few days later, when the defendant tried to talk to her at work, she refused to respond to him. That night, as Agic was leaving work, the defendant came to her car and said "you are pushing me over the edge" by not responding or talking to him. A security guard noticed the interactions between the defendant and Agic and asked if there was a problem. The defendant replied "no." Once Agic began to drive home, the defendant followed her. At one point, the defendant cut her off on the highway forcing her to exit. Out of fear, Agic stopped at a restaurant and called the police. The police told her, however, that she needed

to get a restraining order and that they could not arrest the defendant at that point because he had not physically struck her.

After this call to the police, Agic proceeded to her sister's house in New Britain. The defendant, however, arrived there first. He stopped her outside and told her that he had videotaped her having sex with him on the night they had dinner, and he threatened to show the tape "to [her] family, to [her] job, to everybody" if she did not talk to him. When Agic's sister, Alma Nahic, approached them and asked if there was a problem, Agic told her "nothing" because the defendant had told her, "I will kill them. I will kill you. You don't know who you are dealing with. You better come with me." Agic complied and went to the defendant's apartment.

Sometime thereafter, the defendant moved into Agic's apartment. Agic testified: "[The defendant] wouldn't leave. He was constantly with me everyday. . . . Everyday he was working with me. . . . If he page[d] me, and I [didn't] answer, he [would] pull me into the bathroom. He [would] kick my knee and stomach or something . . . [b]ecause, I had to respond to him, literally, every five minutes to make sure I [was] there. The defendant had become "obsessed with me. . . . [H]e was with me all the time."

Although Agic testified that the defendant's abusive conduct continued throughout their relationship, the first incident that led to police intervention occurred in early July, 2000, at Agic's apartment. That day, the defendant struck Agic with a shower rod, causing Agic to sustain bruises all over her body, including her head. The defendant told her to report to others that she had been in a car accident and directed her to cover her bruises with makeup. When the defendant did not approve of the manner in which she had applied the makeup, he kicked her in the stomach several times

and then he applied the makeup, after which he allowed her to leave for work.

Later that day, Agic called her friend, Phyllis Bevridge, who accompanied her to a hospital where Agic underwent a computerized axial tomography (CAT) scan and was treated for a concussion. Agic then reported the assault to the New Britain police department, where her bruises were photographed. The defendant subsequently was arrested and charged in relation to his physical abuse of Agic with a shower rod. After leaving the hospital, Agic and her daughter spent one night at Bevridge's house and then two to three weeks in a shelter. After Agic and her daughter left the shelter, they moved into Alma Nahic's residence.

On July 30, 2000, the day prior to the defendant's scheduled court date regarding the shower rod incident, the defendant approached Agic in a CVS pharmacy parking lot. He asked Agic to marry him so that she could not be forced to testify against him in court. Agic testified that the defendant told her that if "I [didn't] marry him, that he [was] going to—he is going to kill me and my family and my daughter. He [was] going to make sure [my daughter] got raped and tortured."

The next morning, on July 31, 2000, the defendant and Agic went to city hall and were married. Agic explained that she married the defendant out of fear and because she did not want to put her family in danger. That afternoon, Agic accompanied the defendant to the courthouse for an assigned court date relating to the shower rod incident, but she left before the proceedings were concluded. As a result of these proceedings, a family violence protective order was issued against the defendant. The protective order forbade the defendant (1) "from imposing any restraint upon the person or liberty of the victim"; (2) "from threatening, harassing, assaulting, molesting, or sexually assaulting

the victim"; and (3) from committing any violence against the victim.

The protective order, however, terminated neither the interactions between Agic and the defendant nor the abuse of Agic by the defendant. Moreover, the defendant, with the use of repeated threats, convinced Agic to resume living with him in his West Hartford apartment. On or about September 11, 2000, the defendant had a scheduled court appearance in New Britain to which Agic accompanied him. Upon arrival and in order to avoid the court proceeding, the defendant feigned illness. Although Agic refused to follow the defendant's instruction to lie to the court marshal by confirming the defendant's fake illness, the court proceeding was continued so that the defendant could be examined by a physician.

Later that day, when the defendant and Agic returned to the apartment, he pushed Agic onto the kitchen floor. He was angry at Agic for not supporting his ruse at the courthouse. After pushing the victim down, the defendant grabbed, by the handle, a six inch to eight inch diameter pan that had a "very thick bottom" with which he repeatedly struck the victim's head. Her fingers were also bruised and dislocated because of her attempts to deflect the blows. Agic, nevertheless, waited six or seven days to report this incident to the police.

A few days later, on September 15, 2000, Agic took the defendant's car because hers was not working properly, and drove herself and her daughter to Alma Nahic's house in New Britain. Before arriving, she called the defendant and explained that she was not coming back, as she could not take his abuse any longer.

The next morning, on September 16, 2000, the defendant called Agic at Alma Nahic's residence seeking reconciliation. Agic refused but told the defendant that she would be returning to the apartment in about one

hour solely to retrieve her car and her personal belongings. When the defendant asked Agic why it would take one hour for her to make the fifteen minute trip to his apartment, the victim explained that she "was not going there by [herself]" and intended "to call the police to escort [her] . . . ."

A short time after this telephone conversation, Agic's mother, Sefka Nahic, who also was at Alma Nahic's house, saw the defendant running toward the house. Agic testified that "[t]he door . . . was unlocked. So [Sefka Nahic ran] in the living room toward the kitchen to lock the door. She never got to lock the door. [The defendant] pushed [Sefka Nahic] so hard [into] a dining [room] table. [Sefka Nahic] went on top of [the table] with her back." Agic also stated that the defendant had a "screwdriver in his hand . . . ." When Sefka Nahic fell on the table, the defendant placed the screwdriver under her neck. Alma Nahic then ordered the defendant to leave her house, threatening to call the police if he refused. In response, the defendant pushed Alma Nahic and placed the screwdriver under her neck. As she attempted to use the telephone, the defendant removed it from her hand and pulled the telephone cable from the wall. The defendant then grabbed Agic by one arm and began to physically drag her out of the house. Agic's sister and mother grabbed Agic's other arm and attempted to stop the defendant, who told Agic that she "better tell them to let her go" or he "will push this screwdriver into [her] ribs."

The defendant then pressed the screwdriver to Agic's back with one hand, held Agic's arm with the other and directed her to walk down the driveway to her car. He instructed her to walk "like there is nothing going on," telling her, as he held the screwdriver to her back, that "if you move, I will not only kill you, they will all be dead. I don't care what [is] going to happen to me. I will get out, like I always did." At first they entered

Agic's car, but it would not start. Accordingly, they took the defendant's car and drove to his apartment.

Meanwhile, after the defendant and Agic had departed from Alma Nahic's house, the police were called from a neighbor's residence and were dispatched to the defendant's apartment. Upon arrival, the police forcibly entered the apartment and removed the defendant. Out of fear of the defendant, Agic refused to explain what had happened. Two days later, however, on September 18, 2000, she gave a written statement to the police, describing the events in full.

The defendant was charged in two separate criminal files. In CR14-546183, in the judicial district of Hartford, by information dated January 20, 2004, the state charged that between September 12 and 14, 2000, the defendant committed the crime of assault in the second degree in violation of § 53a-60 (a) (2). In CR15-191421, in the judicial district of Hartford, by information dated December 31, 2003, the state charged that, on or about September 16, 2000, the defendant committed the crimes of kidnapping in the second degree in violation of § 53a-94 (a), burglary in the third degree in violation of § 53a-103 (a) and criminal violation of a protective order in violation of § 53a-110b.

Although CR15-191421 originally was filed in the judicial district of New Britain, it was later transferred to the judicial district of Hartford. After the case had been transferred and shortly before the start of voir dire in CR14-546183, the state successfully moved to consolidate CR15-191421 and CR14-546183 for trial. After the jury found the defendant guilty on all charges, the court sentenced him to a total effective term of nineteen years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court abused its discretion by permitting the state to introduce prior

uncharged misconduct evidence through Agic's testimony at trial. The uncharged misconduct evidence related to the following: (1) the defendant's continuous and repeated acts of physical and verbal abuse toward Agic; (2) the defendant's constant threats of physical abuse directed at Agic and her family; and (3) the defendant's statement that he would reveal to her family and coworkers a video recording of himself and Agic engaged in sexual intercourse after their business dinner if she tried to avoid or ignore him. Specifically, the defendant's objection to the admissibility of this evidence was not based on relevance or materiality. Moreover, the defendant concedes that the evidence was probative. Instead, his sole argument on appeal is that the evidence was highly prejudicial and greatly outweighed any probative value that it may have had, thereby causing him undue prejudice. We disagree and conclude that the evidence was not unduly prejudicial and was admissible pursuant to § 4-5 (b) of the Connecticut Code of Evidence and pertinent case law.[2]

"[A]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . We have recognized exceptions to this general rule, however. Evidence of prior misconduct may be admissible . . . for other purposes, such as to prove knowledge, intent, motive, and common scheme or design . . . . Accordingly, [our Supreme Court has] established a two-pronged test for determining the admissibility of prior misconduct evidence. Such evidence is admissible if: (1) it is relevant and material to at least one of the circumstances encompassed by the exceptions; and (2) its probative value

___

[2] Connecticut Code of Evidence § 4-5 (b) provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."

outweighs its prejudicial effect." (Citations omitted; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 390, 844 A.2d 810 (2004).

"A trial court's ruling on the admissibility of evidence is entitled to great deference and will be overturned only if a clear abuse of the court's discretion is shown and the defendant shows that the ruling caused substantial prejudice or injustice. An appellate tribunal is required to make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Thomas*, 96 Conn. App. 578, 583–84, 901 A.2d 76, cert. denied, 280 Conn. 912, 908 A.2d 542 (2006). Thus, the standard we employ to review this claim is whether the court abused its discretion in allowing this evidence of prior misconduct. Because the defendant concedes that the evidence of misconduct was relevant and material, we need address only whether the evidence was unduly prejudicial to the defendant.

"[E]vidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The court bears the primary responsibility for conducting the balancing test to determine whether the probative value outweighs the prejudicial impact, and its conclusion will be disturbed only for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *DeJesus*, 91 Conn. App. 47, 64, 880 A.2d 910 (2005), cert. granted on other grounds, 279 Conn. 912, 903 A.2d 658 (2006).

The defendant contends that the prior misconduct evidence unnecessarily aroused the jurors' emotions and hostility against him, and, thus, its prejudicial effect greatly outweighed its probative value. We disagree. The uncharged misconduct evidence was offered for six specific purposes. The evidence regarding the defendant's uncharged assaultive and abusive behavior toward Agic was offered to demonstrate: (1) his intent when he committed the charged crimes of assault, kidnapping, burglary and violation of a protective order; (2) his motive when he committed the charged crimes; (3) his system of criminal activity directed at Agic; (4) his malice toward Agic; (5) Agic's reactions as a battered woman to his conduct after he committed the charged crimes; and (6) his conduct in early July, 2000, when he hit Agic for the manner in which she covered up her bruises, to establish the reason for the issuance of the family violence protective order that he was charged with having violated.

We believe that the court exercised sound discretion in determining that the prior misconduct evidence was not unduly prejudicial and that the probative value of that evidence outweighed any prejudicial effect to the defendant. The court properly ruled that, because Agic observed firsthand and was the main recipient of the defendant's abuse, her testimony regarding the defendant's uncharged misconduct was relevant and material. The court reasoned that the evidence showed the effect of the defendant's conduct on Agic[3] and explained

_____

[3] The court also observed that the proffered uncharged misconduct evidence was relevant to Agic's conduct subsequent to the charged offenses. In particular, the evidence presented during trial indicated that after the defendant assaulted Agic and after he kidnapped her, Agic did not immediately report the crimes to the police. The defendant's prior abusive behavior directed against the victim permitted the inference that she was a battered woman, suffering from what has been classified as battered woman syndrome. See *State* v. *Yusuf*, 70 Conn. App. 594, 608–609, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002).

Evan Stark, an expert in domestic violence and battered woman syndrome, testified that it is consistent for a woman in an assaultive relationship, who

her actions and responses, the history of the relationship between Agic and the defendant, the motive of the defendant to commit the crimes, the defendant's intent to do so and a pervasive system of criminal activity the defendant committed against Agic.

The defendant nevertheless argues that the similarity of the charged crimes to the prior uncharged misconduct was more prejudicial than probative because the jury was more likely to view the misconduct testimony relating to the prior episodes of abuse as propensity evidence. We disagree. "[T]he mere fact that the uncharged misconduct and the charged crime are similar does not make the uncharged misconduct evidence overly prejudicial." *State* v. *McFarlane*, 88 Conn. App. 161, 165, 868 A.2d 130, cert. denied, 273 Conn. 931, 873 A.2d 999 (2005). In fact, courts have stated that the striking similarities of the prior offenses to the charged offenses made them highly probative. See *State* v. *Madore*, 45 Conn. App. 512, 522–23, 696 A.2d 1293 (1997) (considerable similarities between defendant's behavior in charged and uncharged misconduct rendered evidence highly probative).

Here, both the charged and uncharged misconduct were related to the abusive conduct of the defendant and, thus, highly probative. Furthermore, because the jury already had heard, and was in the process of hearing, evidence of the charged abusive offenses, the uncharged misconduct evidence was not singularly shocking. See *State* v. *Cooper*, 227 Conn. 417, 427, 630 A.2d 1043 (1993) (where evidence similar to uncharged misconduct permeated trial, reviewing court found it difficult to believe uncharged misconduct evidence "could have had a tendency to shock or influence the

has been assaulted over a period of time, not to report immediately all incidents of assault to the police because the woman is aware that the perpetrator likely will not be held accountable and, subsequently, will take further abusive action against the woman.

jury or to color the proceedings so as to deprive the defendant of a fair trial"). Thus, the court properly found that the prior uncharged misconduct was similar in nature to the crimes charged and stated, therefore, during colloquy with counsel that "we are not introducing something that is going to be so shocking that it isn't already going to be introduced with respect to the conduct."

Moreover, the court minimized the potential prejudice to the defendant of the admitted prior misconduct evidence by giving the jury detailed limiting instructions as to the role the evidence was to play in its deliberations immediately after Agic's testimony and repeated its admonition to the jury in its final instructions.[4] "Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct." (Internal quotation marks omitted.) *State* v. *Orellana*, 89 Conn. App. 71, 89, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence. See *State* v. *James G.*, supra, 268 Conn. 397–98; see also *State* v. *Anderson*, 86 Conn. App. 854, 870, 864 A.2d 35 (jury presumed to follow court's instructions absent clear evidence to contrary), cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005).

Accordingly, we find no fault with the court's conclusions that the significant probative value of the evidence with regard to the defendant's past abusive conduct toward Agic outweighed any prejudice to the defendant. The care with which the court weighed the evidence

---

[4] The court provided the jurors with detailed instructions that the only purposes for which they could consider the acts of uncharged misconduct were to assess the defendant's intent and motive in committing the charged crimes, to assess the defendant's system of criminal activity and malice directed toward Agic, and to explain the cause of the issuance of the protective order and how the conduct impacted Agic's state of mind.

and devised measures for reducing its prejudicial effect weighs against a finding of abuse of discretion. See *State* v. *Erhardt*, 90 Conn. App. 853, 862, 879 A.2d 561, cert. denied, 276 Conn. 906, 884 A.2d 1028 (2005). Thus, we conclude that the court did not abuse its discretion in admitting the evidence of prior uncharged misconduct.

II

Next, the defendant claims that there was insufficient evidence to support his conviction of (a) assault in the second degree in violation of § 53a-60 (a) (2), (b) burglary in the third degree in violation of § 53a-103 (a), (c) criminal violation of a protective order in violation of § 53a-110b, now § 53a-223, and (d) kidnapping in the second degree in violation of § 53a-94 (a). We are not persuaded.

We begin by setting forth the applicable standard of review. "In reviewing [a] sufficiency [of evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged

beyond a reasonable doubt. . . . Moreover, [i]n evaluating evidence that could yield contrary inferences, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Williams*, 93 Conn. App. 844, 852–53, 890 A.2d 630 (2006).

## A

The defendant's first sufficiency claim relates to his assault conviction. Section 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person . . . by means of a . . . dangerous instrument . . . ." Moreover, General Statutes § 53a-3 (7) provides in relevant part that a " '[d]angerous instrument' means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ." Accordingly, "[a]n ordinary object may be a dangerous instrument. Therefore, [e]ach case must be individually examined to determine whether, under the circumstances in which the object is used or threatened to be used, it has the potential for causing serious physical injury. . . . The question of whether in the given circumstances a particular object was used as a dangerous instrument is a question

of fact for the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *McColl*, 74 Conn. App. 545, 554, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003).

Agic testified that on or about September 11, 2000, the defendant pushed her to the floor and repeatedly struck her with a six inch to eight inch diameter pan, which had a very thick bottom. The defendant's sole claim that the evidence was insufficient to support his conviction is that the state did not introduce the actual pan into evidence. This claim is without merit.

The defendant does not cite and we cannot find any case law that supports his proposition that the dangerous instrument used in the crime of assault must be introduced into evidence for the conviction to be supported by sufficient evidence. To the contrary, there is decisional law supporting the state's contention that the instrument does not have to be introduced into evidence. See *State* v. *Dumas*, 54 Conn. App. 780, 786–87, 739 A.2d 1251 (even though neither party introduced knife into evidence, victim's testimony was sufficient to support conclusion that defendant was guilty of charges related to dangerous weapon and dangerous instrument), cert. denied, 252 Conn. 903, 743 A.2d 616 (1999). Therefore, on the basis of Agic's testimony and after construing the evidence in a light most favorable to sustaining the verdict, we believe that the jury's determination that the defendant pushed Agic to the floor and repeatedly struck her with a pan was reasonable on the basis of the facts presented and the inferences drawn therefrom. Accordingly, the evidence was sufficient to support the defendant's conviction of assault in the second degree.

B

The defendant also claims that there was insufficient evidence to convict him of burglary in the third degree

in violation of § 53a-103 (a)[5] because the evidence was insufficient to prove that he intended to commit a crime when he entered Alma Nahic's residence.[6] Specifically, the defendant argues that he entered her house with a screwdriver in hand solely to give Agic's car back and to return the screwdriver. We are unpersuaded.

"It is well established that [t]he question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Internal quotation marks omitted). *State* v. *Watson*, 50 Conn. App. 591, 605, 718 A.2d 497, cert. denied, 247 Conn. 939, 723 A.2d 319 (1998), cert. denied, 526 U.S. 1058, 119 S. Ct. 1373, 143 L. Ed. 2d 532 (1999), cert. dismissed, 255 Conn. 953, 772 A.2d 153 (2001).

Here, the jury reasonably could have found that immediately after entering the residence and striking Sefka Nahic, the defendant held the screwdriver to her throat. He subsequently put the screwdriver to Alma Nahic's throat and then to Agic's back while forcibly removing her from the house. These facts amply support the jury's conclusion that the defendant unlawfully entered the residence with the intent to commit a crime

[5] General Statutes § 53a-103 (a) provides: "A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

[6] The defendant also claims that the testimony from Agic and Alma Nahic and Sefka Nahic relating to this charge was not credible. As noted previously, it is solely the province of the jury to assess the credibility of witnesses. Accordingly, this argument must fail.

therein. Accordingly, the evidence was sufficient to support the defendant's conviction of burglary in the third degree.

C

The defendant further claims that there was insufficient evidence presented to support his conviction of criminal violation of a protective order in violation of § 53a-110b,[7] now § 53a-223, because the incorrect docket number was written on the protective order admitted into evidence. We disagree.

The following additional facts are pertinent to the defendant's claim. At trial, the state introduced into evidence a family violence protective order that had been issued against the defendant on July 31, 2000.[8] Although the defendant correctly asserts that the family protective order issued to him contained the wrong docket number, all the pertinent information on the protective order given to him was in fact correct. The protective order that was introduced into evidence identified the defendant by name and date of birth. The protective order also identified the victim, Agic, by her name and address. The defendant was ordered pursuant to the protective order to refrain (1) "from imposing any restraint upon the person or liberty of the victim"; (2) "from threatening, harassing, assaulting, molesting,

---

[7] General Statutes (Rev. to 1999) § 53a-110b provides in relevant part: "A person is guilty of criminal violation of a protective order when an order . . . has been issued against such person, and such person violates such order." In 2001, § 53a-110b was transferred to General Statutes § 53a-223.

[8] Karen Sandler, the courtroom clerk on July 31, 2000, testified that there was no indication on the document itself that the defendant was in court the day that the protective order was issued. She also testified, however, that if the defendant was not in court when the order was issued, a bail letter or rearrest order would have been issued that day, but that in this matter, no bail letter had been sent, nor had the court ordered his rearrest for failure to appear. Because neither a rearrest order nor a bail letter was issued, it was reasonable for the jury to infer that the defendant was present and received a copy of the protective order on July 31, 2000.

or sexually assaulting the victim"; and (3) from committing any violence against the victim.

The essence of the defendant's claim in this regard is that because the protective order put into evidence at trial bore the wrong docket number, there was insufficient evidence to convict him of criminal violation of the protective order. As noted, the court ruled that the incorrect docket number did not invalidate the lawfully issued family violence protective order instructing the defendant to refrain from committing any violence against Agic. This ruling, while not directly challenged on appeal, was proper. Our Supreme Court has repeatedly "eschewed applying the law in such a hypertechnical manner so as to elevate form over substance." *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 34, 848 A.2d 418 (2004). Accordingly, the protective order properly was before the jury for its consideration. Thus, upon our review of the record, we believe that there was ample evidence for the jury to conclude that there was in fact a protective order issued on the germane date to the defendant on behalf of Agic, and that the defendant violated it when he forcibly removed Agic from Alma Nahic's residence. Accordingly, the evidence was sufficient to support the defendant's conviction of criminal violation of a protective order.

## D

The defendant's final sufficiency claim is that there was insufficient evidence presented to support his conviction of kidnapping in the second degree in violation of § 53a-94 (a). In sum, the defendant claims that he was convicted on the basis of inconsistent and noncredible testimony by Agic. In essence, the defendant's claim, though cloaked in terms of sufficiency, is an attack on the credibility of the state's principal witness. He makes

no claim that if credited, the testimony of Agic was an insufficient basis for his conviction of kidnapping.

"Whether [a witness'] testimony [is] believable [is] a question solely for the jury. It is . . . the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 93 Conn. App. 739, 751, 890 A.2d 591, cert. granted on other grounds, 277 Conn. 930, 896 A.2d 102 (2006). "The process of inference is peculiarly a jury function, the raison d'etre of the jury system." (Internal quotation marks omitted.) *State* v. *Flowers*, 85 Conn. App. 681, 692, 858 A.2d 827 (2004), rev'd on other grounds, 278 Conn. 533, 898 A.2d 789 (2006). This court does not sit as a seventh juror to cast a deciding vote. "We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. . . . The scope of our factual inquiry on appeal is limited. This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) Id. Accordingly, construing the evidence in the light most favorable to sustaining the verdict and deferring to the jury's credibility determinations, we conclude that there was ample evidence, in the form of the testimony of Agic, to support the defendant's kidnapping conviction.

The judgments are affirmed.

In this opinion the other judges concurred.